In re CRYSTAL APPAREL,
INC., et al., Debtors.

Bankruptcy Nos. 94 B 40318(PCB)
through 94 B 40329(PCB).

United States Bankruptcy Court,
S.D. New York.

April 16, 1998.

818

Shereff, Friedman, Hoffman & Goodman, LLP by Shalom Jacob, Lorri Staal Rosen, New York City, for Michael B. McLearn and Gerald M. Chaney.

Wachtell, Lipton, Rosen & Katz by Theodore Gewertz, David Bryan, New York City, for the Unofficial Committee of Institutional Lenders.

Cleary, Gottlieb, Steen & Hamilton by Thomas J. Moloney, Shari Siegel, New York City, for the Official Committee of Unsecured Creditors.

*MEMORANDUM DECISION GRANTING MOTION FOR SUMMARY JUDGMENT OF DEBTORS AND DENYING CROSS–MOTION OF CLAIMANTS*

PRUDENCE CARTER BEATTY, Bankruptcy Judge.*

This court has already ruled on this matter once. However, following an appeal, the matter was remanded for further consideration. Two former employees, Michael B. McLearn ("McLearn") and Gerald B. Chaney ("Chaney") (collectively the "Claimants"), of one of these Chapter 11 debtors have moved for payment as an expense of administration of claims of $675,238.69 and $729,567.66, respectively, they have filed that assert that certain employment agreements provide for payment to them of 2.99 times their base salaries in the event that a change of control

of the debtors resulted in their termination or a substantial reduction in their duties. A contested matter has resulted from opposition to the requested relief by the Official Creditors Committee of Unsecured Creditors and the Unofficial Committee of Institutional Lenders. This court's original decision was made on the parties' cross-motions for summary judgment.

In its original ruling this court held that there were no material facts in issue on the expense of administration status claimed by McLearn and Chaney and that the claimed payments were not allowable as expenses of administration. In so ruling, this court relied on its reasoning in its earlier decision, *In re Hooker*, 145 B.R. 138 (Bankr.S.D.N.Y. 1992) (hereafter *"Hooker"*), familiarity with which was presumed. While the facts in the *Hooker* case differed from those in this case, this court considered at length in *Hooker* the nature of the term severance pay and its relationship to the claimed payment in *Hooker* as well as, presciently, the type of claim made here. This court concluded in *Hooker* that, even though the payments sought by the claimant there could be termed severance pay in a generic sense, the term severance pay as used by the Second Circuit in certain key bankruptcy decisions was a term of art. This court analyzed the Second Circuit authorities. This court concluded that the Second Circuit would not find its prior decisions to mandate the treatment of the payments as expenses of administration in light of subsequent developments in the corporate world respecting executive compensation as well as the magnitude of the claims being sought by the individual.

In this case, this court concluded that the payments sought by the Claimants here were "golden parachute" payments and that any agreement to make such payments was out of the ordinary course of business of a debtor in possession. Thus, court approval was required for the debtors in possession to enter into such an agreement and none had been obtained. This court also concluded that the Claimants' pre-petition employment agreements had never been assumed. District

---

\* Formerly known as Prudence Beatty Abram.

Judge Shira A. Scheindlin vacated this court's order and remanded the matter for further consideration in light of her opinion. *See In re Crystal Apparel, Inc. (Chaney, et al. v. Official Committee of Unsecured Creditors, et al.)*, 207 B.R. 406 (S.D.N.Y.1997). The District Court noted its concern that this court may not have appropriately applied the standards applicable to motions for summary judgment. More significantly, the District Court instructed this court look to the horizontal and vertical two-step test discussed in a number of cases as a way of determining whether a transaction is entitled to expense of administration status. The District Court took issue with this court's position that the grant of "golden parachute" benefits could never be in the ordinary course of business of a debtor in possession and that court approval is always required. The District Court also pointed to several additional issues this court had apparently not considered connected to the sale of the debtor's assets.

Following remand and on April 2, 1997, the attorneys for the parties appeared before this court at its request. They urged that the matter should be decided by this court on the basis of the original motion papers. All parties expressly declined this court's invitation to submit additional papers addressing the District Court's decision.

For the reasons discussed herein and based on the findings of fact which follow, and giving due deference to the concerns of the District court, this court adheres to its original conclusion that the requests for payment as expenses of administration made by Chaney and McLearn must be denied.

### FINDINGS OF FACT [1]

#### General Background

1. On January 21, 1994 (the "Petition Date"), Crystal Apparel, Inc. and its subsidiaries and affiliates (collectively, the "Debtors"), including its parent Crystal Brands, Inc. ("Crystal"), filed with this Court voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). Shortly thereafter the court ordered that the cases be consolidated for procedural purposes only and jointly administered. No trustee was appointed and the Debtors became debtors in possession. At the Petition Date, the Debtors were insolvent, the Debtors' assets were heavily liened and prospects that unsecured creditors would receive more than the proverbial ten cents on the dollar were uncertain.

2. Crystal was a publicly owned Delaware Corporation which produced, marketed and sold high-quality apparel and apparel-related accessories for men, women and boys under well-known brand names such as "Izod," "Gant" and "Salty Dog." These products were produced in the United States and in foreign countries by independent suppliers and sold throughout the United States to department and specialty stores, including 135 retail stores operated by one of the Debtors' subsidiary. The Debtors also sold sportswear under the "Izod Club," "Izod International" and "U.S. Open" labels through golf and tennis shops nationwide and licensed selected brand names for other merchandise, such as dress shirts, neckwear, accessories, watches, eyewear, outerwear, tailored clothing and sportswear. Crystal's common stock was listed on the New York Stock Exchange, Inc. (the "NYSE") and as of the petition date was held by 5,223 stockholders of record. As of July, 1994 the Debtors employed approximately 3,150 persons.

3. In early February 1994, the United States Trustee appointed seven unsecured creditors to the Official Committee of Unsecured Creditors (the "Official Committee").

4. Six institution secured lenders (the "Lenders") also formed an Unofficial Committee of Institutional Lenders (the "Unofficial Committee" and together with the Official Committee, the "Committees"). The

---

1. The Findings of Fact are based on the Joint Statement of Undisputed Facts submitted by the Committees and the Claimants as required by Local Bankruptcy Rule 7056 as supplemented by this court's requirement that a single document be presented to it embodying all parties' factual positions. *See In re CIS Corp., (Hassett v. Citi-* *corp North America)*, 188 B.R. 873 (S.D.N.Y. 1995) This latter requirement facilitates this court's ability to discern the disputes between the parties and the reasons for those disputes. Certain background finding are based on the Chapter 11 file.

members of the two Committees hold allowed unsecured claims in an amount of $131 million which represents approximately 85% of the claims of the allowed unsecured claims.

5. The court approved the Debtors' Third Amended Disclosure Statement (the "Disclosure Statement") on June 9, 1995 (Case Document No. 1103). The Debtors' Third Amended Plan (the "Plan") (Case Document No. 1173) was confirmed on July 25, 1995. As an integral part of the Plan, the Debtors' cases were substantively consolidated. The Debtors' common stock was canceled and terminated and the shareholders will get no distribution. The Debtors' unsecured creditors are expected to receive less than 50 cents on the dollar (out of over $150 million in estimated allowed claims owed to them) under the Plan.

6. On the date that it approved the Disclosure Statement, the court also set July 14, 1995 as the last date for filing administrative claims.

### The McLearn and Chaney Administration Claims

7. On July 13, 1995, Chaney and McLearn each filed administrative claims. Chaney's administrative claim sought $729,-567.66 and McLearn's $675,238.69. The administrative claims were based upon identical provisions in certain employment agreements with Crystal providing for a "change of control" payment, or what in the corporate world's shorthand has come to be called a "golden parachute." [2] The employment agreements relied on are described *infra* and the existence of these contracts is not in dispute. At the time they filed their proofs of claim, Chaney and McLearn also filed the motions seeking payment of the Claims (the "Motions"). The Committees filed papers in opposition to the Motions.

8. As of the Petition Date, Chaney was employed by Crystal as its Executive Vice President/Operations and Chief Financial Officer. McLearn was employed by Crystal as Vice President, General Counsel and Secretary. Chaney and McLearn had been employed as senior executives of Crystal for about nine years before the Petition Date pursuant to various employment agreements with Crystal.[3]

9. Prior to the Petition Date and for the period from the Petition Date through consummation of the sale of substantially all of the Debtors' remaining assets on February 17, 1995, neither Chaney nor McLearn was represented by counsel. However, McLearn is an attorney and was the Debtors' general counsel.

2. A "golden parachute" is a provision in an executive's contract that provides for payment in the event of termination or a defined loss in status after a defined change in control of the company. "Golden parachute" provisions have become common in the corporate world and are designed, in part to protect against changes in control of a corporation and to compensate the executive in the event that a change of control does occur. Under the provisions of the Internal Revenue Code, a "golden parachute" is deductible as an ordinary business expense so long as it does not exceed 2.99 times the executive's base compensation. *See* 26 U.S.C. § 280G(b)(A) and (b)(3) (1986).

3. McLearn's first employment agreement was dated August 26, 1985 and expired August 26, 1988. Prior to the termination of that agreement and after Crystal's acquisition of General Mills Fashion Group, McLearn and Crystal entered into a new agreement for a term expiring November 25, 1989 at an enhanced salary. The next agreement ran from November 24, 1989 to November 23, 1992. By letter agreement the term was extended until May 31, 1993. That agreement was replaced with the Employment Agreement dated March 31, 1993 (the "McLearn Employment Agreement") which provided for McLearn's employment as Vice President, General Counsel and Secretary through May 31, 1994. Chaney's first agreement was dated October 25, 1985 and provided for Chaney's employment through October 24, 1986. His next agreement was dated November 25, 1986 and provided for his employment until November 25, 1988. A new agreement as of November 25, 1988 provided for his employment until November 24, 1989. During the term of this Agreement, Crystal promoted Chaney to the position of Chief Financial Officer ("CFO"). His subsequent agreement as of November 24, 1989, was scheduled to expire on November 23, 1992. By letter agreement dated November 20, 1992, Chaney's employment was extended through May 31, 1993. An Employment Agreement dated March 31, 1993 (the "Chaney Employment Agreement") extended Chaney's employment as Crystal's Vice President and CFO until May 31, 1994. Several months before the Petition Date, Chaney was promoted to the position of Executive Vice President/Operations and CFO.

10. In mid-September 1995, the Official Committee filed a response to the Motions and moved for summary judgment denying the Motions and disallowing the Claims. Thereafter in late October 1995 the Unofficial Committee also filed a response opposing the motions and likewise moved for summary judgment denying the Motions and disallowing and expunging the Claims. The Unofficial Committee's motion was based upon certain of the grounds raised by the Official Committee's motion, as well as upon additional grounds. On or about November 2, 1995, Chaney and McLearn cross-moved for summary judgment allowing and directing payment of their Claims. The present decision concerns only the issue of whether the claims are entitled to administration expense status. Whether Chaney and McLearn have allowable pre-petition claims is not before the court at this time.

### The McLearn and Chaney Employment Agreements

### The Prepetition Employment Agreements

11. As of the Petition Date, January 21, 1994, the Chaney Employment Agreement and the McLearn Employment Agreement (together, the "Employment Agreements") governed the terms of Chaney's and McLearn's employment by Crystal. Section 2 of each of the Employment Agreements provided that, unless the employee was oth-

erwise terminated pursuant to § 7 thereof, the term of his respective employment was to "continue through the close of business on May 31, 1994, and shall thereupon terminate." Section 4(a) of the Employment Agreements provided that the "Executive's salary shall be reviewed annually, effective January 1, at which time the Corporation may, but is not required to, increase the amount of such salary. Any increased salary shall become Executive's basic salary for all purposes of this agreement."

12. Section 7(e)(ii) of the Employment Agreements provides that if a "Change of Control"[4] occurs and the employment of the employee is thereafter terminated without cause or there is a constructive termination, the terminated employee "shall be entitled to an immediate payment in cash equal to 2.99 times his base amount (the "Change of Control Payment")." Section 7(e)(iii) defines a "Constructive Termination" as, *inter alia,* (i) "any reduction in the amount of any compensation," including salary and benefits, (ii) a "loss of the Executive's title or any change, without the Executive's written consent in the Executive's position, duties, responsibilities, authority or reporting relationship" or (iii) "a material change in management conditions, without the Executive's written consent, as a result of which the Executive determines in good faith that he is no longer able to carry out the duties and responsibili-

---

4. Section 7(e)(i) of each of the Employment Agreements reads as follows:

"(i) For purposes of this Agreement, a 'Change in Control' shall be deemed to have occurred if and when (A) any 'person' as such term is used in Section 3(a)(9) and 13(d)(3) of the Securities Exchange Act of 1934 (the "34 Act"), or Group, as such term is used in Section 13(d)(3) or 14(d)(2) of the 34 Act (including persons having common objectives or goals, or who have otherwise indicated publicly their intent to act together), is or becomes the beneficial owner, directly or indirectly, of securities of the Corporation representing more than 50 percent of the combined voting power of the then outstanding securities of the Corporation; (B) individuals who constitute the Board on the date hereof, (the 'Incumbent Board') cease for any reason to constitute at least a majority thereof, provided that any person becoming a director subsequent to such date whose election, or nomination for election, was approved by a vote of at least two-thirds of the directors

comprising the Incumbent Board shall be, for purposes of this clause (B), considered as a though he were a member of the Incumbent Board; or (C) the Corporation combines with another company and (I) the shareholders of the Corporation hold less than 50 percent of the total of all voting shares outstanding or to be outstanding as a result of the combination, or (II) the Corporation's directors constitute less than 51 percent of the Board of Directors of the combined entity."

The Committees have urged that none of the defined events constituting change of control have occurred. The Claimants point to a change in the membership of the Board of Directors under which all directors resigned except one. Whether this dispute is a purely factual one or a purely legal one or some mixture, this court declines to reach the issue on the present motions, which are addressed to the status of the Claims as expenses of administration, as unnecessary in light of this court's legal conclusions. The present motions do not deal with the allowability of the claims as general unsecured claims.

ties of his office as originally contemplated between the parties hereto."

### The Peat Marwick Draft Report

13. Shortly after the filing of the Debtors' chapter 11 petitions, the Debtors, with the Court's approval, retained the accounting firm of Peat Marwick ("PM"). The Performance and Compensation Management Division of PM did an analysis of the compensation which Crystal paid to its employees. In a draft report dated March 11, 1994 (the "PM Compensation Report"), PM concluded that the Debtors risked losing their most valuable personnel not only because their bankruptcy "created an uncertain environment" (id. at 1.1), but also because the compensation which they paid to their employees was "significantly below industry practices" (id. at 2.1). The PM Compensation Report also reached the following conclusions:

Crystal Brands' best people are the ones most likely to be recruited by competitors

Without any security, there is more reason to listen to recruiters and pursue other opportunities now

Key executive losses result in even greater losses below the executive level

Replacing key employees would be difficult and expensive due to Crystal Brands' chapter 11 status

Filling positions may take some time, resulting in disruption due to vacancies

Recruiters typically charge approximately 30% salary plus guaranteed bonuses or sign-on bonuses

A premium would have to be paid to attract an employee into a chapter 11 company

Key recruits would probable require employment contracts and guaranteed severance placed in escrow or secured

PM Compensation Report at 2.4.

### The Postpetition Letters

14. After the Petition Date, in a one-page letter dated March 28, 1994 (the "McLearn Extension Letter") Crystal, through its Chief Executive Officer and Chairman of the Board, Charles J. Campbell ("Campbell"), notified McLearn that "on February 23, 1994, the [Crystal] Board of Directors authorized me to extend and amend the terms of your Employment Agreement." This brief letter stated that the term of McLearn's employment was extended for an additional year, from June 1 1994 through May 31, 1995. In addition it stated that McLearn's basic salary was being increased from $202,000 to $227,-000, a 12.5% increase in pay. The provision for a salary increase was consistent with the provision in the McLearn Employment Agreement that his salary would be reviewed each January. This letter concluded that "except as extended or amended, all the other terms and conditions of your Employment Agreement shall remain in full force and effect."

15. Similarly, in a postpetition one-page letter dated March 28, 1994 (the "Chaney Extension Letter") (collectively with the McLearn Extension Letter, the "Extension Letters"), Crystal, through Campbell, notified Chaney that "on February 23, 1994, the [Crystal] Board of Directors authorized me to extend and amend the terms of your Employment Agreement." This letter was virtually identical to the McLearn Extension Letter and likewise made only two changes to the Chaney Employment Agreement. First, it extended the term of Chaney's employment for an additional year, from June 1, 1994 through May 31, 1995. Second, it increased Chaney's basic salary from $225,000 to $250,000, an increase of just over 11%. This letter also concluded that "except as extended or amended, all other terms and conditions of your Employment Agreement shall remain in full force and effect."

16. The Extension Letters, which were drafted by McLearn in his capacity as General Counsel for the Debtors, made no explicit reference to the Change of Control Payment provision in the Employment Agreements. Nor were copies of the Employment Agreements attached to the Extension Letters.

17. The Debtors did not seek or obtain the approval of the Bankruptcy Court of the Extension Letters at or about the time they were entered into. The Claimants contend, as set forth below, that an order entered in early 1995 approving the sale of virtually all of the Debtors' assets effected the assump-

tion of the Employment Agreements and Extension Letters.

### The Development of the Plan and The Debtors' Apparel Incentive Program

18. From the Petition Date in late January 1994 and until the early Fall 1994, the Debtors worked at reorganizing their operations and proposed plan of reorganization.

19. In early November 1994, several parties indicated interest in purchasing the Debtors' remaining businesses. The Lenders and the Official Committee wished to determine whether a sale was a viable alternative to the Debtors' plan and therefore requested a two week adjournment of the hearing on the adequacy of the Second Amended Disclosure Statement. When it appeared that a sale was a viable alternative, the disclosure statement hearing was further adjourned while potential buyers conducted due diligence investigations of the Debtors' operations.

20. By January 1995, the Debtors, after negotiations conducted by the Debtors and the Unofficial Committee, had decided to sell substantially all of Crystal's assets to Phillips Van Heusen Corporation ("PVH").

21. When it had become apparent to the Debtors that a sale or sales of its assets was more likely than confirmation of the plan put forth by the Debtors, the Debtors raised with the Committees the issue of establishing a "sale bonus pool" for the members of Debtors' management, including Chaney and McLearn, who were responsible for responding to potential buyers' due diligence requests. The Debtors based their proposal to the Committees on two grounds. The first was that its top executives were being asked to remain with the Debtors throughout the sales process even though any sale or sales could well result in the termination of their employment. The second basis was that the Debtors would be able to avoid the considerable expense of retaining an investment banker to assist in the sale process because of the assistance of the Debtors' management.

22. After securing the approval of the Committees to the sale bonus pool, the Debt-

ors made a motion to approve the program (the "Apparel Incentive Motion"), on January 11, 1995.[5] The Apparel Incentive Motion sought approval of the bonus pool for Campbell and up to sixteen of the Debtors' executives. In addition, the motion expressly sought to assume Campbell's prepetition employment contract with Crystal.

23. In its motion papers, under the heading of "Employment Agreements", the Debtors stated as follows:

> "[A]s these chapter 11 cases proceeded, it became apparent to the Debtors that they would have to enter into new compensation agreements with certain key employees in order to retain a nucleus of personnel who had been and would be critical to their efforts to restore profitability and their reorganization efforts as debtors in possession. In that regard, during the chapter 11 cases, the Debtors negotiated certain severance arrangements (the 'Severance Arrangements') with approximately 12 key employees pursuant to letter agreements, and in the case of two key senior executives, extended their prepetition employment contracts which were due to expire on May 31, 1994, for an additional year through May 31, 1995 (the 'Contract Extensions'). *The Debtors have proposed to pay these fourteen individuals severance pay or liquidated damages as the case may be, if their contracts are not assumed by a purchaser of the Apparel Business or if they are only employed by the purchaser on a transitional basis.* As a result of the Severance Arrangements and the Contract Extensions, in the event of a sale of the Apparel Businesses, these employees will receive relatively modest severance payments in accordance with the terms and conditions of their individual Severance Arrangements or Contract Extensions." (emphasis added).

*Id.* at 15–17.

24. The Debtors disclosed in a footnote each employee, their position and specific severance amounts granted in the Severance Arrangements. Then, in the next footnote

---

**5.** This type of motion is fairly standard in larger Chapter 11 cases.

they disclosed that the "two key senior executives" referred to were

"Michael B. McLearn, Vice President, Secretary and General Counsel, and Gerald M. Chaney, Executive Vice President–Operations and Chief Financial Officer. Upon termination without cause, these two executives would receive (i) base salary for one year, (ii) incentive compensation, (iii) long term incentive compensation, (iv) the right to continue to participate in stock option program, (v) the fight to participate in all employee benefit programs and pension plans, and (vi) use of a private office for six months following termination."

*Id.* at n. 5.

25. Nowhere in the Apparel Incentive Motion was any reference made to the Change of Control Payment contained in the Employment Agreements. Nor were copies of the Employment Agreements attached. In fact, as set forth in the prior Finding, the Apparel Incentive Motion explicitly stated that McLearn and Chaney would receive only one year's base salary in the event of their termination without cause. Further the Debtors represented that the employees, including McLearn and Chaney, would receive only relatively modest severance payments.

26. No request was made in the Apparel Incentive Motion for approval of the assumption of the Employment Agreements as amended by the Extension Letters.

**The Sale of Substantially All of the Debtors' Assets to Phillips–Van Heusen Corporation**

27. On or about January 19, 1995, the Debtors signed new Severance Agreements with Chaney and McLearn (the "New Chaney/McLearn Severance Agreements"). Chaney and McLearn do not dispute that they signed these agreements. Section 1 of the New Chaney/McLearn Severance Agreements provides, among other things, as follows:

"Effective from and after the occurrence of any merger, consolidation or other business combination transaction involving the Corporation, or any sale of all or substantially all of the assets of the Corporation (each a "Transaction"), in the event of a termination by the Corporation, its successors or assigns (including the successor to its business following a Transaction ("Buyer")) of Executive's employment without Cause or a Constructive Termination (as such terms are defined below) thereof occurring during the period commencing on June 1, 1995 and ending on the first anniversary of the closing of such Transaction, Executive's rights to compensation and benefits shall be as follows:

(i) Executive shall be paid in a lump-sum his annual base salary at the greater of (a) his current annual base salary or (b) the rate in effect on the date of termination of employment, payable upon the date of termination.

(ii) Executive shall be entitled to continue to participate for one year in any and all benefit programs and pension plans maintained by the Corporation or Buyer (if this Agreement is assigned to Buyer) (other than group life insurance and long-term disability insurance, which shall terminate on the last date of active employment if the policies which provide such insurance require such termination of insurance coverage), provided that Executive's right to any such benefits shall terminate on the date Executive becomes entitled to the same or any similar benefits as a result of Executive's entering into subsequent employment; and any other rights in regard thereto, if any, shall be determined under each of such programs and plans, respectively. Executive agrees promptly to notify the Corporation or Buyer, as the case may be, of any subsequent employment which may cause the cessation of benefits under this clause (ii). If Executive's employment is terminated prior to June 1, 1995, the provisions of the Employment Agreement shall govern his rights resulting therefrom."

28. The Debtors sought court approval of the New Chaney/McLearn Severance Agreements as part of its January 26, 1995 application seeking approval of the PVH sale.

29. The Court granted the Apparel Incentive Motion on February 3, 1995 without objection by the Committees (after a limited objection by the Official Committee had been

resolved). The order granting the Apparel Incentive Motion (the "Apparel Incentive Order") provided in pertinent part as follows:

"ORDERED that *** the adoption of the Apparel Incentive Program by the Debtors is approved and in the event the Apparel Sale is consummated, the Debtors are authorized and directed to establish a compensation pool (the 'Compensation Pool') in an amount equal to one percent of up to $130 million of the sale proceeds received or resulting from the Apparel Sale, *plus* five percent of the sale proceeds in excess of $130 million received or resulting from the Apparel Sale, up to a maximum of $2,000,000; and it is further

\* \* \* \* \* \*

"ORDERED that in the event the Apparel Sale is consummated, the Debtors are authorized and directed to pay on the effective date of a plan of reorganization Apparel Awards from the Compensation Pool to those employees, and in such amounts, as may be determined by Charles J. Campbell ('Campbell') as Chairman, Chief Executive Officer and sole director of Crystal Brands; provided, however, that Campbell shall receive an Apparel Award equal to twenty (20%) percent of such pool and no other employee shall receive an Apparel Award in an amount in excess of eight (8%) percent of such pool; provided, further, however, that each person who is entitled to receive an Apparel Award shall be required to agree in writing (a) to remain in the employ of the Debtors until the earlier of (i) the effective date of a plan of reorganization, (ii) the date on which he or she becomes employed by a purchaser in the Apparel Sale or (iii) the date on which his or her employment is involuntarily terminated without cause, and (b) to forfeit the right to such payment to the Debtors immediately upon the breach of the foregoing agreement; and it is further

\* \* \* \* \* \*

"ORDERED that pursuant to section 365(a) of the Bankruptcy Code, Crystal Brands is authorized to assume the Campbell Agreement; provided, however, that Campbell shall be deemed to have waived all claims against the Debtors' estates (but not as against any purchaser at an Apparel Sale) in the event his employment is terminated without cause or is constructively terminated (as defined in the Campbell Agreement) (a) pursuant to section 7(e)(ii) of the Campbell Agreement and (b) pursuant to sections 4(b) and 7(d)(ii) if, and only if, an Apparel Sale is consummated with a purchaser that assumes the Campbell Agreement as part of such sale."

30. Nothing in the Apparel Incentive Order required the Debtors to make any payment to Chaney or McLearn unless such payments were designated by Charles Campbell. By letter dated May 9, 1995, Campbell designated sixteen employees of Crystal (in addition to himself) to receive between two and eight percent of the Compensation Pool authorized by the Apparel Incentive Order. Under this designation, Chaney and McLearn were each to receive eight percent of the Compensation Pool, or about $91,000 each.

31. As of January 24, 1995, the Debtors and PVH entered into an Asset Sale Agreement (the "Sale Agreement"). The Sale Agreement provided, among other things, for the sale to PVH of substantially all of the assets of the Debtors' remaining apparel and retail businesses (other than cash and cash equivalents). The assets to be sold to PVH included all of the Debtors' (i) furniture and equipment, (ii) leases, (iii) inventory, (iv) contracts and agreements relating to the Business (as defined in the Sale Agreement), the employment and severance agreements scheduled in the Sale Agreement, (v) unfilled sales orders, and (vi) "all of [the Debtors'] Business as a going concern (including, without limitation, [all of the Debtors' trademarks and trade names])." As consideration for the Sale, PVH agreed to "a cash payment of approximately $114.7 million (subject to adjustment based on tangible net worth) and the assumption of liabilities estimated to total $34.16 million as of a projected closing date."

32. Section 2(d)(viii) of the Sale Agreement provided as follows:

"(d) *Assumption of Liabilities.* Purchaser hereby agrees that as of the Closing it will assume and agree to pay, perform and

discharge all of the following liabilities and obligations of Seller ***:"

"(viii) all severance and other obligations of Seller under employment and severance contracts with persons who are employees of the Business as of the closing date and *** and which contracts are set forth in part (iii) of Schedule 3(e) hereto; *provided, however,* except for the severance obligations under the Employment Agreement, dated as of August 18, 1993, between Crystal Brands, Inc. and Charles J. Campbell, no such obligation shall exceed a period of one year."

Part (iii)(a) of Schedule 3(e) of the Sale Agreement listed the "Severance Agreements between Crystal Brands, Inc. and each of Mike McLearn and Gerald Chaney, to be entered into prior to the Closing Date, each in the form of *Attachment 3* to this Schedule." A draft form of the New Chaney/McLearn Severance Agreements was annexed as Attachment 3 to Schedule 3(e) of the Sale Motion. Part (iii)(b) of Schedule 3(e) of the Sale Agreement expressly included "[a]ll severance obligations listed in Attachment 1 of Item 1 of Schedule 2(a)(v)." Attachment 1 to Item 1 (entitled "Employment Related Agreements") of Schedule 2(a)(v) listed various agreements, including agreements with each of Chaney and McLearn described as having an "Agreement Date" of "3/31/93 and amended on 3/28/94."

33. On January 26, 1995, the Debtors made a motion for approval of the Sale Agreement and authorization to sell substantially all of their assets to PVH pursuant to the Sale Agreement.

34. The Sale Motion stated at ¶ 35 as follows:

"Specifically, pursuant to the Sale Agreement, the Debtors will assign to PVH the prepetition employment contract in respect of Crystal Brands' Chief Executive Officer and Chairman of the Board, and the two postpetition employment agreements (the "Postpetition Employment Agreements") (and two new severance agreements) for the Executive Vice President–Operations and Chief Financial Officer, and Vice Pres-

ident, General Counsel and Secretary.[6] The agreement with the Chairman and Chief Executive Officer is subject to a motion to assume currently pending before the Court and the Debtors seek to assign such agreement as part of the Sale. The Debtors are seeking authority herein to assign the two Postpetition Employment Agreements, as modified, which expire in May 1995, and to enter into and assign two new severance agreements with the last two individuals identified above providing them with severance pay of up to one year base salary if they are terminated without cause. These three individuals have consented to the assignment of their respective agreements to PVH. In addition, Seller will assign and PVH will assume (and relieve the Debtors of liability for) approximately twelve other postpetition severance agreements with the Debtors' mid-level executives and employees which provide these individuals with severance pay if certain conditions are met.

35. This Court granted the Sale Motion on February 17, 1995 without objection by the Committees. Pursuant to the order approving the sale (the "Sale Order"), this Court approved the Sale Agreement. The seventh decretal paragraph of the Sale Order provided that "pursuant to section 365 of the Bankruptcy Code, the Seller's assumption and/or assignment, as the case may be, of each of the. *** contracts [and] agreements *** listed and described in Schedules 2(a)(ii) and 2(a)(v) to the Sale Agreement or contemplated by the Sale Agreement are approved and authorized in all respects, subject to the Debtors' prompt cure of the defaults thereunder, if any."

36. Promptly after the signing of the Sale Order, the PVH transaction was consummated. Chaney and McLearn became employees of PVH. At some point thereafter, Chaney and McLearn were terminated or constructively terminated as employees by PVH.

37. PVH has paid to Chaney the sum of $364,783.83 and to McLearn the sum of $339,315.88, representing one year of their respective "base amount compensation", the

---

**6.** These were the positions held by McLearn and Chaney.

amount provided in the New Chaney/McLearn Severance Agreements and which provided for in Attachment 3 to Schedule 3(e) of the Sale Motion and approved by the Sale Order.

38. The amounts claimed as an administrative expense by Chaney ($729,567.66), and by McLearn administrative expense ($675,238.69) are equal to 2.99% of their respective base amount compensation less the amounts paid to them by PVH.

## DISCUSSION

### Standards for Summary Judgment

### Summary Judgment Standard

Federal Rule of Civil Procedure ("FRCP") Rule 56, made applicable to adversary proceedings by Bankruptcy Rule ("B.R.") 7056, provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 89 L.Ed.2d 538 (1986).

A fact is material only if it affects the result of the proceeding and a fact is in dispute only when the opposing party submits evidence such that a trial would be required to resolve the differences. *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *In re Tikijian*, 76 B.R. 304, 313 (Bankr.S.D.N.Y.1987). The court's function when faced with a motion for summary judgment is to determine whether there exist any genuine issues of material fact to be tried, and not to resolve any factual disputes. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir.1996); *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir. 1983); *In re Ross*, 64 B.R. 829, 836 (Bankr. S.D.N.Y.1986).

In ruling on a motion for summary judgment, the court is required to draw all factual inferences in favor of, and take all factual assertions in the light most favorable to, the party opposing summary judgment. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 36 (2d Cir.1994). If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with affidavits, depositions, or other sworn evidence setting forth specific facts showing that there exists a genuine issue of material fact. *Rule*, 85 F.3d at 1011; *accord* Rule 56(e). However, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56. Instead, the nonmovant must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely *** on the basis of conjecture or surmise." *Trans Sport v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

Moreover, the evidence favoring the nonmoving party must be more than merely colorable. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11. A mere scintilla of evidence is not enough to create a genuine issue of fact. *See Id.* at 252, 106 S.Ct. at 2512. There must be evidence upon which a jury may reasonably rely; and a party may not escape summary judgment on the mere hope that something will turn up at trial. *Id.*; *Ayers v. Pastime Amusement Company*, 283 F.Supp. 773, 793 (D.S.C.1968); *In re General American Communications Corporation*, 63 B.R. 534 (Bankr.S.D.N.Y.1986).

Finally, where the nonmoving party bears the burden of proof on an issue at trial, the moving party may simply point to the absence of evidence to support the nonmoving party's case. *National Lumber and Supply, Inc.*, 184 B.R. 74, 79 (9th Cir. BAP 1995); *In re Brazier Forest Products, Inc.*, 921 F.2d 221, 223 (9th Cir.1990).

The Claimants have cross-moved for summary judgment in their favor. Therefore, a brief discussion should be had of the position faced by a court when cross-motions for summary judgment are made.

The court must take care to consider each motion separately with respect to analyzing whether any material facts are in issue. One movant's position may depend on a factual finding as to which a material issue of fact exists. There may not be material facts in dispute on the cross-motion. However, the court cannot assume no material facts are in dispute merely because cross-motions for summary judgment have been made.

■ Only if both sides are proceeding on the same legal theory is it relatively likely that the material facts will not shift as the court shifts between the two motions. When the movants are relying on different arguments, it is much more likely that the court will have to carefully step through the facts to determine that material facts are not in dispute. The court needs to ensure that the non-moving party on each theory gets the benefit of having the inferences to be drawn from the underlying facts viewed in the light most favorable to it as the party opposing the motion. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578–88, 106 S.Ct. 1348, 1351–57, 89 L.Ed.2d 538 (1986).

■ The court must also be mindful that the underlying facts are required to be ones that would be admissible in evidence at trial and shown through an affidavit by one competent to testify. F.R.C.P. 56(e). Put yet another way, the disputed facts must be material before the court need concern itself

with drawing inferences favorably to the non-movant as well as admissible at trial. This court finds that many of the so-called disputed facts in the parties' Joint Statement are irrelevant and would not be admissible into evidence at any trial.[7] It is perfectly appropriate for the court to make evidentiary rulings on a motion for summary judgment. *See General Electric Co. v. Joiner,* —— U.S. ——, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

### *The Governing Law*

One of the issues confronting this court in analyzing the cross-motions for summary judgment is to determine what are the governing provisions of the Bankruptcy Code. This dispute has been viewed by the District Court primarily in the light of Code § 363. However, this court has always viewed the matter as having a strong Code § 365 component. In the final analysis, as will become clear for the discussion below, this court concludes that whichever Code provision is the starting point the Claimants cannot prevail. The court will first consider the issues related to Code § 363.

### *Ordinary Course of Business*

■ A Chapter 11 debtor in possession's transactions other than those in the ordinary course of business must be authorized by the court after notice and a hearing. See Code § 363(b); *In re Dant & Russell, Inc.,* 853 F.2d 700, 704 (9th Cir.1988); *In re Waterfront Co., Inc. v. First Street Co.,* 56 B.R. 31,

---

7. For example, Chaney and McLearn seek to have this court make findings relative to employment contract of Judith Bode who was hired on the eve of filing to run the Debtors' jewelry business. Apparently they offer this evidence to establish a course of conduct by the Debtors or to establish what the law is or to try to gain sympathy by measuring their situation against someone else's. None of these reasons render this evidence material. Thus this court has made no finding with respect to Ms. Bode's employment. The court does not find relevant the identities of counsel for the Committees or the Debtors, their professional credentials or the fees they received in these cases.

Apparently the Claimants chose not to retain their own counsel until after their employment by PVH terminated. At no time were the Claimants entitled to treat the Debtors' counsel as representing them. *See Code* §§ 327(a), 1103(b); *see also e.g., Cinema 5 Ltd. v. Cinerama, Inc.,* 528 F.2d 1384 (2nd Cir.1975); *Fund of Funds, Ltd. v.*

*Arthur Andersen & Co.,* 567 F.2d 225 (2nd Cir. 1977); *In re Caldor,* 193 B.R. 165 (Bankr. S.D.N.Y.1996); *In re Celotex Corp.,* 123 B.R. 917, 920 (Bankr.M.D.Fla.1991); *Phoenix Electrical Contracting Corp. v. New York Telephone Co.,* 155 Misc.2d 250, 252–53, 587 N.Y.S.2d 485, 486–87 (1992); Model Code of Professional Responsibility DR 5–105 (1980). For that reason, the Claimants attempt to offer evidence, which is disputed, about oral statements made by counsel for the Debtors about the lack of need for court approval of the Extension Letters is rejected. Even assuming the facts the Claimants allege are true, they are immaterial. Good faith reliance on the advice of someone else's counsel, even if proven, is not an issue that assists the Claimants. The Claimants cannot bind this court to hold in their favor by making such a showing. The approval of counsel or even the Committees or Debtor is not a substitute for court approval of any transaction found to require court approval.

34 (Bankr.D.Minn.1985). A debtor in possession is authorized to operate its business "unless the court, on request of a party in interest and after notice and a hearing orders otherwise". See Code § 1108. Transactions "in the ordinary course of business" may be entered into by a debtor in possession without notice or a hearing. *See* Code § 363(c)(1) and *In re James A. Phillips, Inc.,* 29 B.R. 391, 394 (S.D.N.Y.1983). The purpose of requiring notice and hearing if a transaction is other than in the ordinary course of business is so that creditors, who have a vital interest in maximizing realization from assets of the estate, have an opportunity to review the terms of the proposed transaction and to object if they deem the terms and conditions are not in their best interest. *See In re Caldor, Inc.,* 193 B.R. 182, 186 (Bankr.S.D.N.Y.1996).

As the court in *In re The Leslie Fay Cos., Inc.,* 168 B.R. 294, 301 (Bankr. S.D.N.Y.1994) stated "[t]hese provisions were designed to allow a trustee (or debtor in possession) the flexibility to engage in ordinary transactions without unnecessary oversight, while protecting creditors by giving them an opportunity to be heard when transactions are not ordinary." *In re Roth American, Inc.,* 975 F.2d 949, 952 (3rd Cir.1992); *In re Johns–Manville Corp.,* 60 B.R. 612, 616 (Bankr.S.D.N.Y.1986) rev'd on other grounds, 801 F.2d 60 (2d Cir.1986); *Phillips,* 29 B.R. at 394 ("[T]he apparent purpose of requiring notice only where the use of property is extraordinary is to assure interested persons of an opportunity to be heard concerning transactions different from those that might be expected to take place so long as the debtor in possession is allowed to continue normal business operations under 11 U.S.C. § 1107(a) and § 1108"). Thus "if the debtor were to agree to do something extraordinary *** or to do an act which is inimical to the theory and philosophy of the Code, such as the payment of pre-petition indebtedness, then *** pursuant to section 363(b)(1) the agreement is not enforceable absent notice and a hearing." *Leslie Fay,* 168 B.R. at 294; *Johns–Manville,* 60 B.R. at 617–18. The showing of ordinary course of business assures that neither the debtor nor any of its creditors can do anything abnormal either to dissipate assets or gain inappropriate advantage over other creditors. *See, Dant & Russell,* 853 F.2d at 704; *Johns–Manville,* 60 B.R. at 618.

Transactions in the ordinary course of business of the debtor in possession create expenses of administration. Code § 503(b)(1)(A) provides that the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case are entitled to be allowed as administration expenses. In order to qualify as an administrative expense, under Code § 503(b)(1)(A) the expense (1) must arise out of a postpetition transaction between the debtor in possession and the creditor and (2) relate to consideration both supplied to and beneficial to the postpetition estate's operations of its business. See *In re New York Trap Rock Corp.,* 137 B.R. 568, 572 (Bankr.S.D.N.Y.1992). In *In re Klein Sleep Products, Inc.,* 78 F.3d 18 (2nd Cir. 1996) the Second Circuit commented as follows:

"[b]y requiring the court to determine the reasonable necessity of the newly entered contract under § 503(b), Congress has insured some judicial control over the determination of what executory contract will be granted administrative expense priority. The Code, in order to streamline reorganization procedure, allows a debtor in possession to enter into contracts in the ordinary course of business without seeking court approval. Thus, contracts initially entered into during reorganization, unlike contracts assumed during reorganization, will not have undergone court scrutiny. *By limiting automatic administrative expense treatment *** to assumed contracts, and by requiring initially entered contracts to qualify under § 503(b) in order to be granted an administrative expense priority. Congress has insured both similar treatment and similar procedural safeguards for these fundamentally similar obligations."* 78 F.3d at 25–26 (emphasis added).

(quoting, *In re Chugiak Boat Works, Inc.,* 18 B.R. 292, 297–98 (Bankr.D.Alaska 1982))

(footnotes omitted); *see also, Multech,* 47 B.R. at 751–52.

■ Typically courts examine the "horizontal" and "vertical" dimensions of a debtor's business to address these policies reflected in the Code and to determine whether a transaction is outside the ordinary course of business. *See In re Lavigne,* 114 F.3d 379, 384 (2nd Cir.1997); *Leslie Fay,* 168 B.R. at 303; *In re Drexel Burnham Lambert Group, Inc.,* 157 B.R. 532, 537 (S.D.N.Y. 1993); *Johns–Manville,* 60 B.R. at 616. This multi-dimensional concept is intended to be both expansive and flexible. *See, Johns–Manville,* 60 B.R. at 616. However, if either dimension of the test is not satisfied, the disputed transaction is not in the ordinary course of business. *See, Leslie Fay,* 168 B.R. at 304; *In re Media Central,* 115 B.R. 119, 124 (Bankr.E.D.Tenn.1990).

■ The horizontal analysis is an external industry-wide comparison of the debtor's business and other like businesses to see if the transaction is ordinary for this type of business. *See Lavigne,* 114 F.3d at 385; *Dant & Russell,* 853 F.2d at 704; *Leslie Fay* 168 B.R. at 304; *Drexel Burnham,* 157 B.R. at 537; *Johns–Manville,* 60 B.R. at 618; *Waterfront,* 56 B.R. at 34–35. The vertical dimension examines the reasonable expectations of interested parties as to this particular debtor in possession. *See, Leslie Fay* 168 B.R. at 304; *Phillips,* 29 B.R. at 394.

■ "The touchstone of 'ordinariness' is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Lavigne,* 114 F.3d at 384–85; *see also Roth American,* 975 F.2d at 953; *Dant & Russell,* 853 F.2d at 704; *Drexel Burnham,* 157 B.R. at 537; *Johns–Manville,* 60 B.R. at 617; *Waterfront,* 56 B.R. at 35; *Phillips,* 29 B.R. at 394. The court in *Phillips* contrasted transactions which are by their nature "preferential" and objectionable with transactions which involve the normal uncertainties involved in any effort at reorganizing a debtor and bringing it out of Chapter 11. *Id.* at 395. *Phillips* pointed out that some issues that arise in a Chapter 11 case are such that "creditors *** should have an opportunity to be heard, however summarily,

before *** payments are formally authorized by a Bankruptcy Court. Such an opportunity would ensure that the facts alleged by the debtor in possession are at least colorably supported, and would avoid preferential payments that may be commercially unsupportable or downright fraudulent." 29 B.R. at 395.

One of the first cases to articulate the two dimensional test, *Waterfront, supra,* observed that there is something that it said could be called the vertical dimension

"Even though something is the type of transaction in which this debtor could be expected to take part, is it the type of transaction that is in the *ordinary* course of business? Some transactions either by their size, nature or both are not within the day-to-day operations of a business and are therefore extraordinary." *Id.* at 35.

*See also Lavigne,* 114 F.3d at 385; *Dant & Russell,* 853 F.2d at 705; *Johns–Manville,* 60 B.R. at 617. *Waterfront* found that the post-petition indemnity agreement signed by the majority shareholder for the debtor was not the type of transaction which creditors expect a debtor will enter into without notice to creditors and other interested parties. 56 B.R. at 35. *Waterfront* also noted that this was especially true when the transaction was for the benefit of an insider and that the sophisticated business people involved knew that the transaction was questionable and that no notice to creditors had been given or court approval had been obtained, 56 B.R. at 35–36.

■ This branch of the test further analyzes the transaction "from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *Dant & Russell,* 853 F.2d at 705 (quoting, *Johns–Manville,* 60 B.R. at 616); *see also Drexel Burnham,* 157 B.R. at 537 (same). Although typically the primary focus is on the debtor's pre-petition business practices and conduct, the court must "consider the changing circumstances inherent in the hypothetical creditor expectations." *Roth American,* 975 F.2d at 952. The inqui-

ry includes whether "the nature of the [transaction] ventures beyond the domain of transactions that a hypothetical creditor would reasonably expect to be undertaken *in the circumstances.*" *Id.* at 954. (emphasis added).

Upon the filing of a Chapter 11 case, all parties are aware that a successful reorganization may well require a change in control of the debtor, both through a change in management and through a change in ownership. This is the legal reality the Code imposes whatever the economics and facts are with respect to a particular debtor. Unless a debtor's assets are sufficient to pay creditors 100% on the dollar, the shareholders of a Chapter 11 debtor have no right to expect to be able to retain their interests because of the embodiment of the absolute priority rule in Code § 1129(b). See particularly Code § 1129(b)(2)(B).

The factual reality is that many Chapter 11 debtors are unsuccessful in their attempts to reorganize. Others cannot reorganize except by selling some or all of their assets and using the proceeds to pay creditors. Even those that avoid outright failure or dismemberment often end up partially or wholly owned by their creditors or a stranger to the exclusion of former shareholders.

The present dispute can only be understood if this ever present knowledge that a change of control is a very real possibility whenever a Chapter 11 case is filed is kept firmly in mind. Although the economics of this Debtors' business on the Petition Date was certainly relevant to the likely future course of this particular case, it is the larger context of the very nature of the Chapter 11 process that mandates the conclusion that the Claims are not ones of a type that a debtor in possession can enter into without court approval and therefore do not qualify for expense of administration status unless court approval is obtained. The fact that express court approval was sought for Campbell's contract is some evidence of the Debtor's acknowledgement of the need for court approval.

Even if this court accepts the premise that "golden parachutes" are common outside of bankruptcy in the apparel industry, that does not mandate the conclusion that entering into a contract providing for such a payment is in the ordinary course of business for a Chapter 11 retail debtor. If that were so, nothing would seem to be out of the ordinary course of business in a chapter 11 case. Certainly "golden parachutes" are commonly granted by corporations only to select upper management. It is unrealistic to believe that upper management can act with dispassion in fixing their own compensation, including "golden parachutes," during the turbulence of a Chapter 11 case. The creditors and any committees are entitled to scrutinize such agreements before they become binding.

▮▮▮▮ Entering into a "golden parachute" contract is not a daily occurrence for any given corporation. Indeed such an event might not even occur as often as once a year. Seeking court approval for what is an exceptional event for any given corporation, even if it is generally accepted corporations do enter into these types of agreements regularly, imposes little burden on a debtor. Ordinariness is also measured by how often a given type of event occurs and whether the need to obtain court approval becomes too onerous to allow the debtor to operate. Considering a "golden parachute" to be "ordinary" would clearly violate the policy of § 363(c)(1) which "is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets." *Lavigne,* 114 F.3d at 384; *Roth American,* 975 F.2d at 952. Requiring review and approval of these infrequent but often monetarily very significant transactions is not overly burdensome to the debtor in possession.

A simple example will suffice to illustrate this last principle of ordinariness. A debtor in possession which owns and manages a 1,000 unit apartment complex could not reasonably be expected to seek court approval for each lease transaction. Yet, a debtor owning a building with three store units will need to obtain court approval of a new lease because it is making a long-term commitment, the terms affect the feasibility of any plan. Nor is obtaining court approval of only three transactions burdensome.

At that moment of cleavage of the debtor into debtor and debtor in possession that occurs on the petition date, the creditors become entitled to prior notice whenever the debtor in possession seeks to commit itself to pay a "golden parachute" to one of its executives. The debtor as debtor in possession is operating in a different context and must behave responsibly in accordance with the changed environment. Management stays at the helm and is entrusted to make sound business judgments so that the company can survive. They may not violate the trust given to them by operating as if nothing has changed. It is antithetical to the very concept of reorganization under Chapter 11 to hold what may become a huge administrative expense is merely an ordinary course of business transaction when it would be triggered by an event which is very likely to occur because of the bankruptcy.

> "The Code is not meant to straitjacket the debtor and prevent it from responding quickly to normal business demands; neither, however, is the Code meant to allow the debtor the same freedom it had when it got into financial trouble in the first place. For with bankruptcy come certain obligations to creditors, including affording creditors the right to be heard when the debtor proposes to do something beyond the ordinary."

*Leslie Fay*, 168 B.R. at 304.

The bankruptcy court must approve the agreement because it is not in the ordinary course of the *debtor in possession's business* because it is inimical to the policies of the Bankruptcy Code to so prefer top management without notice to creditors. Any court approval of a "golden parachute" debtor in possession seeks to make would have to include a probability analysis of the likelihood that a change of control would occur so that a cost/benefit analysis can be made. Creditors have a right to consider whether the proposed "golden parachute" imposes a financial cost that exceeds the possible benefit of en-

tering into the agreement and also exceeds the possible detriment that will occur if the debtor in possession does not enter into the agreement. Also relevant to the analysis are the debtor's prospects for reorganization.

Turning back to the facts of this case, it is clear how Code § 363 starts to merge with Code § 365. A look at the Extension Letters on which the Claimants base their claims reveals the conceptual issue. The pivotal problem in characterizing the Extension Letters is their incorporation of all of the terms of the Agreements, including the Change in Control Payment. The Change in Control of Payment provisions do not appear *in haec verba* in the Extension Letters. The Extension Letters merely state that "except as extended or amended, all other terms and conditions of your [pre-petition] Employment Agreement shall remain in full force and effect." The Change of Control Payment is in the pre-petition Employment Agreement. Are the Extension Letters new contracts with the Debtors, as debtors in possession, merely incorporating by reference the terms of the older Agreements? Only from that perspective can the Extension Letters be viewed as post-petition contracts subject only to Code § 363. To the extent the Extension Letters increased the salaries of McLearn and Chaney, this court finds the increase to be in the ordinary course of business. The salary increases were modest, 11–12½%.[8]

Whether or not the extension of the contact term for an additional year was an ordinary course of business transaction is a closer call. But for the one year extension the present dispute would not exist since the Debtors would have been free to terminate the Claimants' employment at any time before consummation of the PVH transaction. In this case, the one year extension, which ran until May 31, 1995, turned out to be a period which extended for three months after the closing of the PVH contract.

---

8. In considering this matter, the court has chosen to include among the factual findings, a finding about Peat Marwick's salary survey. It cannot be used to make a finding that any increase that did not exceed the amount by which the Debtor was below industry norms did not require court approval. However, it does support a conclusion that increases of 11–12.5% to senior executives with salaries of the size being paid to McLearn and Chaney would be considered reasonable and court approval not required for the increases themselves.

Both Claimants had previously been employed for similar or longer time periods over the years. At the outset of the Chapter 11, it was clear that any resolution of these cases would take a minimum of six to nine months. Thus, by extending the contracts for one year, the Debtors as debtors in possession were guaranteed the Claimants' services and ran only the financial risk that their service would not be required for the full year.[9] Therefore, without the Change of Control Payment provision incorporated into, but not actually described in the Extension Letters, the one year contract term was in the ordinary course of business in light of the size and complexity of the Debtors' businesses and the expected length of time the Chapter 11 cases would take until confirmation. This court concludes that *the only aspects* of the Extension Letters that were in the ordinary course of business were those providing for an increase in salary and for the extension of the employment term for one year. To the extent the Extension Letters incorporated the Change of Control Provision, they were out of the ordinary course of business of the Debtors as debtors in possession. Without court approval that provision of the Extension Letters is unenforceable and cannot give rise to an expense of administration. It is undisputed that no court approval was given at or about the time the Extension Letters were signed.[10]

### Executory Contracts

An alternative view of the Extension Letters is that they are simply amendments to pre-petition Employment Agreements, modifying only the term of employment and the salary. If this is the case, then Code § 365 dealing with executory contracts applies. Code § 365(a) permits a debtor in possession subject to the court's approval to assume or reject any executory contract or unexpired lease of the debtor with court approval. It is well established that court approval is required for assumption. *See e.g. In re Thinking Machs. Corp.*, 67 F.3d 1021, 1025 (1st Cir.1995); *In re Frontier Props., Inc.*, 979 F.2d 1358 (9th Cir.1992); *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077 (9th Cir.1989); *In re Harris Management Co.*, 791 F.2d 1412, 1414 (9th Cir.1986); *Whitcomb & Keller Mortgage Co.*, 715 F.2d 375, 380 (7th Cir.1983); *see also*, 3 Collier on Bankruptcy, ¶ 365.03, 365–21 (15th ed.1997). As the Second Circuit pointed out in *Klein Sleep*, quoted *supra*, contracts entered into by the debtor in possession and those pre-petition contracts assumed by the debtor in possession have been treated similarly under the Code and similar procedural safeguards are in place for those "fundamentally similar obligations."

The court-approved assumption of an executory contract by a debtor in possession results in the contract being treated as if it had been made by the debtor in possession post-petition. Furthermore, all claims under the contract, including those for breach, are administration expenses. *See Klein Sleep*, 78 F.3d at 26. Because assumption of an executory contract elevates what was a pre-petition claim into an administration expense entitled to be paid in full, courts are rightly reluctant to approve assumptions by debtors in possession. The assumption of an executory contract early in a Chapter 11 case is particularly disfavored as it is difficult to predict the course of the reorganization will take. *See Klein Sleep, supra*, 78 F.3d at 29 (Second Circuit cautioned the bankruptcy court to grant lease assumptions sparingly and recommended that they await the eve of confirmation when the likely success of the Chapter 11 could be known.) The salutory purpose of Code § 365 to give the debtor breathing room to determine whether to assume or reject an executory contract would be wholly defeated by the rule proposed by

---

**9.** An argument against the view that a one year extension is an ordinary course of business transaction can be based on Code § 502(b)(7). That section limits the allowable pre-petition claim of an employee for damages resulting from the termination of an employment agreement to the compensation provided by the contract, without acceleration, for one year following termination

plus any unpaid compensation due to the date of termination.

**10.** The Claimants have urged that the PVH Sale Order resulted in assumption of the Employment Agreements and Extension Letters. See discussion in next section for the court's rejection of that theory.

the Claimants. *See* Bienenstock Bankruptcy Reorganization (1987) at 67 ("Additionally, the Bankruptcy Code substantially nullifies any leverage that management may have attempted to procure by having so-called golden parachute contracts providing for huge payments to management persons upon termination.")

As pointed out earlier the Code expressly limits the amount of the pre-petition claim of a terminated employee to one year's salary. If an application had been made to assume the Employment Agreements, it is highly questionable whether this court would have permitted assumption over the objection of the Committees of the Employment Agreements with their "golden parachute" provisions since those provisions provided for payments greatly in excess of those available to the employees in the event of rejection.

■ The Claimants assert that the PVH Sale Order resulted in the assumption of their Employment Agreements and Extension Letters by virtue of their inclusion on Attachment 1 to Item 1 of Schedule 2(a)(v) of the PVH Agreement. See Finding 32. In light of the Claimants' express entry into new severance agreements at the time the PVH transaction was being negotiated and the explicit reference in the Sale Motion to the assignment of the post-petition employment agreements on being modified by the new severance agreements, especially since the one-year terms was due to expire in May 1995, it is evident that the new Severance Agreements replaced all severance provisions, including the "golden parachute" clauses. The Claimants are unable to point to any objective indication that the Debtors, PVH or the Committees contemplated that after the consummation of the PVH transaction the Debtors would be left with the expense of administration liability the Claimants assert. Moreover, the Sale Order expressly provided for the assumption and/or assignment of each contract listed on Schedule 2(a)(v).[11] Code

§ 365(k) provides that assignment by a debtor in possession of a contract assumed under Code § 365 relieves the debtor in possession and the estate from any liability for any breach of the contract occurring after the assignment.

### Severance as an Expense of Administration

■ It is well-established in the Second Circuit that severance pay can be an administrative expense. *See In re W.T. Grant Co.,* 620 F.2d 319, 321 (2d Cir.1980); *In re Unishops, Inc.,* 553 F.2d 305, 308 (2d Cir. 1977); *Straus–Duparquet, Inc. v. Local Union No. 3,* 386 F.2d 649, 651 (2d Cir.1967). The treatment of severance pay claims in bankruptcy has a long history in the Second Circuit predating the adoption of the Bankruptcy Code in 1978. The Second Circuit's analytical approach has not been driven by the vertical/horizontal test discussed above but by concern for the welfare of employees who have lost their jobs in a particular case.

The cases have held that if the debtor in possession continues the employment of a worker after the filing date and then terminates the worker, the worker has an expense of administration claim for the entirety of the severance pay available under company policy. Thus, the debtor in possession can become liable for large severance pay claims even though it kept its employees on but for a few weeks. *See W.T. Grant Co.,* 620 F.2d at 321; *Unishops, Inc.,* 553 F.2d at 308; *Straus–Duparquet,* 386 F.2d at 651.

■ Chaney and McLearn reason that since their employment was continued post-petition by the debtors in possession, they are entitled to the Change of Control Payment because they say it is severance pay. This court had occasion to consider a similar argument in the application of this doctrine to a top executive in *In re Hooker,* discussed *supra.* In that case, the executive had a five-

---

**11.** There is a suggestion in the District Court's decision that an order entered during the first days of these cases which authorized the Debtors to continue their past employment practices and policies would constitute assumption of the Employment Agreements. *Crystal Apparel,* 207 B.R. at 408. No party understood that order to effect the assumption of upper managements' contracts. This court would consider fraud to have been practiced by the Debtors' attorneys if the order was intended to have that effect. The Claimants have never asserted any reliance on that order before this court.

year pre-petition employment agreement that provided that if he were terminated during the term of the contract he was entitled be paid the agreed salary for the balance of the term. His employment was terminated a few months post-petition. He sought payment as an administrative expense for the balance due under his contract. This court denied the request.

In this court's view the payment claimed in *Hooker* was not severance as that term has been used by the Second Circuit in its various decisions because it was not based on length of service. Traditional severance gets greater the more years the employee remains. In *Hooker*, the longer executive remained with the company, the less he was due. This court also stated its view that the application of the Second Circuit's decisions in this area, which with but one pre-Code exception, deal with rank and file employees, was inappropriate in the current climate of rapidly increasing corporate executive salaries.

Chaney and McLearn seek to characterize the Change of Control Payment as severance on the grounds that its payment is predicated on their termination or "severance" by the Debtors. However, the Change of Control Payment is not based on length of service and a similar provision with the same 2.99 times base salary has been in their contracts for years. For the reasons discussed at length in *Hooker*, familiarity with which is presumed, this court concludes that the Change of Control Payment or "Golden Parachute" is not severance as the Second Circuit has come to use the term severance, as a term of art, in its decisions in this area.[12] The Second Circuit has yet to decide a case on the issue of whether a pre-petition "golden parachute" becomes an expense of administration simply by virtue of the employee's post-petition continuation as an employee. The Second Circuit evidenced its concern in *Klein Sleep* over the size of the administrative expense claim of the landlord and the effect it had on the recovery of other creditors. "As sympathetic as one may be to the Claimant's defeated expectations, one must be more concerned about the impact on Chapter 11 debtors and their creditors if the proposition the Claimant proposes is approved." *Hooker*, 145 B.R. at 150.[13] Here the Claimants have already received payment in full of one year of their base amount compensation from PVH. Chaney received $364,783.83 and McLearn received $339,-315.88. The additional amounts they seek from the Debtors as administrative expenses total $1,404,806.35. They seek nothing less than a windfall of significant size to the detriment of other creditors.

## CONCLUSION

This court concludes that the Extension Letters, to the extent they incorporated the Employment Agreements with the "golden parachute" clauses, were not ordinary course of business transactions within the meaning of Code § 363(c)(1) and required court approval, which was never obtained. This court also concludes that the "golden parachute" clauses were modified by the New Severance Agreements. The Debtors assumed and assigned the Extension Letters and the New Severance Agreements to PVH under Code § 365(a) with the consent of the Claimants. The Debtors have thus been relieved of further liability by Code § 365(k). Therefore, the claims that Chaney and McLearn assert are not entitled to administration expense status. The Debtors have paid Chaney and McLearn their post-petition

---

12. *Hooker* described that "characterization of the payments due the Claimant under the Contract as severance is fundamental to the Claimant's theory of entitlement *** as an expense of administration." 145 B.R. at 147. Because the contract provision was actually liquidated damages and not "severance" as that term has been developed by the Second Circuit case law, it was not accorded priority as an administrative expense. *Id.*

13. If the court were to find as the Claimants urge, "[n]o debtor could avoid the spectre of extraordinary post-petition liability except by firing all executives prior to filing. The only way to preserve a debtor's freedom of choice and maintain the flexibility and equity which are built into Chapter 11 is to hold that the fight to receive individually negotiated contract termination payments in full hinges on actual assumption and that in the absence of actual assumption the claim is one for quantum meruit only." *Id.*

salaries and benefits such as health insurance. They are entitled to no more.

For the foregoing reasons the motions for summary judgment of the Committees are granted and the motion for summary judgment of the Claimants is denied.