**In re APPLIEDTHEORY CORPORATION, et al., Debtors.**

**No. 02–11868 (REG).**

United States Bankruptcy Court, S.D. New York.

July 14, 2004.

---

Angel and Frankel, by Joshua Angel, Esq., Neil Y. Siegel, Esq., New York, NY, Attorneys for Debtors.

Arent Fox Kintner Plotkin & Kahn, PLLC, by Andrew I. Silfen, Esq. (argued), Carol Connor Flowe, Esq., Schuyler G. Carroll, Esq., Leah M. Eisenberg, Esq., New York, NY, for Official Committee of Unsecured Creditors.

Duval & Stachenfeld LLP, by Kirk L. Brett, Esq. (argued), Stephanie K. Hoos, Esq., New York, NY, for Secured Creditors Halifax Fund, L.P., Palladin, Partners I, L.P., Palladin Overseas, Fund Ltd., DeAm Convertible Arbitrage Fund, Ltd., and Lancer Securities (Cayman) Ltd.

Kleinberg, Kaplan, Wolff & Cohen, P.C., by David Parker, Esq., New York, NY,

Attorneys for Elliott Associates LP and Elliott International LP.

Boylan, Brown, Code, Vigor & Wilson, LLP, by Robert F. Mechur, Esq., (argued) on his own behalf and on behalf of other executives, Rochester, NY, Attorneys for Robert F. Mechur.

## DECISION AND ORDER ON EXECUTIVES' MOTION FOR PAYMENT, AS ADMINISTRATIVE EXPENSES, OF "SEVERANCE" PAYMENTS UNDER EMPLOYMENT AGREEMENTS

ROBERT E. GERBER, Bankruptcy Judge.

In this contested matter in the jointly administered chapter 11 cases of AppliedTheory Corporation and its affiliates ("AppliedTheory," or the "Debtors"), five former executives of the Debtors (the "Executives")[1]—each of whom had a pre-petition employment contract that was duly rejected by the Debtors—move for payment, as an administrative expense with priority over the Debtors' other creditors, of an aggregate of $2.4 million[2] payable to them under their employment contracts upon their departure "with good reason." They rely, in a familiar refrain, on the Second Circuit's 1967 decision in "Straus–Duparquet,"[3] and in two other "Act" cases that followed it,[4] and on the interval—here approximately six weeks—during which they provided post-petition service before leaving the Debtors' employ, before their employment contracts were rejected.

The Executives' motion is opposed by all of the other creditors who have appeared in the case—by the Official Committee of Unsecured Creditors ("Creditors' Committee"), and by Halifax Fund, L.P., Palladin Partners I, L.P., Palladin Overseas Fund Ltd., DeAm Convertible Arbitrage Fund, Ltd., and Lancer Securities (Cayman) Ltd. (collectively, the "Secured Lenders").[5]

Upon consideration of the Executives' contentions, the Court concludes, for reasons set forth more fully below, that the requested amounts cannot be awarded for at least three reasons.[6] First, and most

1. Angelo Gencarelli, III, Denis Martin, Robert Mechur, Edward Siciliano, and Danny Stroud.

2. The estate's creditors refer to the amount due as $2.4 million. The Court computes the total of the Executives' request to be $2.24 million. The difference, if any, is not material to the disposition of this motion.

3. Straus–Duparquet, Inc. v. Local Union No. 3, IBEW (In re Straus–Duparquet, Inc.), 386 F.2d 649 (2d Cir.1967) ("Straus–Duparquet ").

4. Zelin v. Unishops, Inc. (In re Unishops, Inc.), 553 F.2d 305 (2d Cir.1977) ("Unishops "); Rodman v. Rinier (In re W.T. Grant Co.), 620 F.2d 319 (2d Cir.1980) ("W.T. Grant ") (per curiam ).

5. There may continue to be disputes as to the Secured Lenders' ultimate entitlement to secured creditor status. The Court refers to the Secured Lenders as such merely for identifi-

cation, and of course now makes no finding in that regard.

6. Accordingly, the Court does not need to consider whether Straus–Duparquet (which, if on point, would be binding on this Court), was wrongly decided or is no longer good law under the Code. See, e.g., In re Jamesway Corp., 199 B.R. 836, 840 (Garrity, J.) (noting controversy with respect to this, and also that some cases "have questioned the applicability of Straus–Duparquet 'when applied to high-powered, high-priced executives with individually negotiated contracts providing for substantial termination payments,' " but ultimately concluding, in a case of that character, that because the claim was not based on "severance pay" as used in Straus–Duparquet, it did not need to consider whether Straus–Duparquet remains good law).

Also, the Court well understands the creditors' point that Straus–Duparquet should not require payment where the Debtors moved for authority to make the requested

fundamentally, the Court believes that *Straus–Duparquet* has no application here, where the claimed entitlement arises from the termination of a pre-petition contract that was duly rejected. Second, the Executives' request fails to pass muster for allowance of an administrative claim, under section 503(b) of the Code and the case law thereunder. And third, assuming that *Straus–Duparquet* retains vitality under the Code with respect to the factual situation it there addressed, that decision, which authorized payment for severance (and then for only two weeks' pay per employee, an amount which fairly could be said to be "in lieu of notice"), does not apply to claims like these. In contrast to *Straus–Duparquet,* the Executives here seek payment of multiple *years'* salary under contracts with most, if not all, of the attributes of a "golden parachute," and assertions that the requested payments are "severance" amount to no more than a play on words—where the claimed entitlements substantially exceed the amount that would have been earned if the employee remained employed; do not turn on length of service; are not in lieu of notice; and would be due even upon the *employee's* decision to quit. The claims here are not for "severance" of the type that *Straus–Duparquet* deemed worthy of priority status, and it is distinguishable for that reason.

payments, and withdrew their motion after expressed concerns by creditors and the Court, and where allowance of the amounts sought would achieve by indirection what could not be obtained directly. But the Court does not need to reach those contentions, given its conclusions on the more fundamental grounds discussed above and below.

7. It is at least strongly arguable that the Bankruptcy Code's cap on payments to employees for damages resulting from the termination of an employment contract, under Bankruptcy Code section 502(b)(7), limits the Executives' entitlement to an unsecured

Accordingly, the objections to payment are sustained. The Executives' claims are disallowed as administrative claims, and will be reclassified as general unsecured claims, without prejudice to the rights of parties in interest with respect to the allowability of those claims, or statutory limits on their amount.[7]

*Facts*

Though it is at least probable that a number of matters, if relevant to the determination of this motion, would create material disputed issues of fact, many other facts are undisputed. Without objection, the Court determined to take the Executives' allegations as true for the purposes of this motion, and to treat the objections as a demurrer.

On April 17, 2002 (the "Filing Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Code. The Executives were employed by the Debtors prior to the Filing Date, and remained in the Debtors' employ until June 5, 2002,[8] approximately six weeks after the Filing Date, when they ceased rendering services. They performed services including those described below, and their statement as to the work they performed during that time has been taken as true for the purposes of this motion.

claim. *See, e.g., In re Commercial Financial Services, Inc.,* 233 B.R. 885, 893 (Bankr. N.D.Okla.1999) (Rasure, J.) (*"CFS–Bankruptcy "*) (denying administrative expense priority, and continuing that "[t]o the extent that the Movants believe they have claims for Lump Sum Termination Payments, they may submit proofs of claim therefor to the extent permitted by 11 U.S.C. § 502(b)(7) . . .''). Nevertheless, the Court will give the Executives a further opportunity to be heard as to the issue before making a determination in this regard.

8. Committee Reply (ECF # 356) ¶ 23.

On July 10, 2002, about weeks after their departure and 8 weeks after the commencement of the Debtors chapter 11 case, the Executives filed the administrative expense claims which are the subject of this motion, requesting a total of $2.4 million pursuant to their respective employment contracts.[9]

*The Employment Contracts*

Each of the Executives was a party to an employment contract with the Debtors, entered into (and with respect to three of the Executives,[10] amended one or two times) prior to the Filing Date. Except with respect to the amounts payable thereunder, the contracts did not differ in any respects material to this motion.

As each contract provided, it was entered into "in consideration of the mutual covenants and representations contained herein," after which followed a series of covenants—*i.e.*, promises—each of the two contracting sides made to the other. Like most of the other employment contracts this Court has seen, each provided for certain matters to provide basis for "Termination for Cause" (generally, matters involving the Executive's wrongful conduct or material breach) and for other matters to provide basis for "Termination for Good Reason."[11] Each further provided that the Executive would have the right to terminate his employment with the Company for any reason. Each then described the Executive's entitlement if he were dismissed for cause, and the (greater) rights he would have if his employment were terminated without Cause, or if he chose to end it for "Good Reason."

As is apparent from the foregoing, the Executive could have substantial rights even if he left voluntarily, so long as the circumstances surrounding his decision to leave constituted "Good Reason." One of those rights was a substantial payment, pegged to salary, after the Executive's departure. Each contract provided, in its Section 5(a), for payment to the Executive in the event of termination:

> *Without Cause or for Good Reason.* In the event of a termination of the Executive's employment during the Employment Period (i) by the Company other than for "cause" (as provided for in Section 4(a) hereof), (ii) by the Executive for "good reason" (as provided for in Section 4(b) hereof) ... the Company shall pay the Executive and provide him with the following:
>
> (i) Payments. The following payments:
>
> (A) Salary. The Executive's then-current base salary payable for the Non–Compete Period (as defined in Section 8 hereof)[12]

Under the Executives' employment contracts, the Non–Compete period would last two years for Stroud[13] and one year for

---

**9.** Committee Objection (ECF # 237) ¶ 5.

**10.** Claimant Stroud's affidavit asserts that all of the Executives' contracts were amended on February 2, 2001, but documents submitted to the Court suggest that the original contracts of claimants Mechur and Siciliano, executed in January 2001, were not amended at that or any other time. The apparent inconsistency is not material to the determination of the motion.

**11.** The latter included, generally, material diminution in the Former Executive's duties, responsibilities, reporting relationship or title; breach by the Company of its compensation and benefits obligations; material breach by the Company of any other terms of the agreement; and the relocation of the Former Executive's principal place of business beyond 35 miles from its current location. *See, e.g.,* Stroud Contract Section 4(b).

**12.** *See, e.g.,* Stroud Contract Section 5(a).

**13.** *See* Stroud Contract Section 8(a).

the others.[14] Their contracts further provided that if their employment terminated within one year of a change of control for any reason other than by the Company for "cause," the Non–Compete period would be doubled [15]—*i.e.*, to four years and two years, respectively. Thus the practical effect of those provisions—which had at least most of the trappings of "golden parachutes" [16]—was that upon a termination other than for cause, including a voluntary departure by the Executive for "Good Reason", Stroud would receive four year's salary,[17] and the other Executives would receive two.[18]

On February 2, 2001, when a prospective transaction was under discussion that could lead to a change in control of the Debtors, some or all of the contracts were amended to give the affected Executives an even clearer ability to leave their employment voluntarily and still receive the multiple-years' salary. As described by Claimant Stroud in his affidavit:

> When the Amendments were entered into, the Executives were attempting to sell the Debtors, at the behest of the Board. Both the Executives and the Board believed it to be likely that any acquirer would terminate, or require the termination of, some or all of the Executives. The Amendments were entered into to induce the Executives to remain in the employ of the Debtors during the effort to sell the Debtors in the face of the possibility of the termination of their employment.[19]

The February 2 amendment added to the list of circumstances under which the Executive could terminate his employment with Good Reason. Section 4(b), which listed circumstances under which the Executive would have "good reason" to volun-

---

14. *See, e.g.,* Gencarelli Contract Section 8(b).

15. *See, e.g.,* Stroud Contract Section 6(c)(i); Gencarelli Contract Section 5(c)(i).

16. Whether it is "most" or "all" depends on the definition. The Supreme Court has stated that "[t]he term 'golden parachute' refers generally to agreements between a corporation and its top officers which guarantee those officers continued employment, payment of a lump sum, or other benefits in the event of a change of corporate ownership," *see Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 3–4 n. 2, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985)—a definition that the provisions in the Executives' contracts satisfy perfectly. The Internal Revenue Code defines the term "golden parachute payment" for purposes of the Tax Code as any lump-sum severance payment which is three times or more the amount of the employee's base salary. *See* 26 U.S.C. § 280G(b)(2); *Chaney v. Official Comm. of Unsecured Creditors (In re Crystal Apparel, Inc.),* 207 B.R. 406, 410 & n. 6 (S.D.N.Y.1997) (Scheindlin, J.) *("Crystal Apparel–District ")* (noting the statutory definition). Here the payments were not required to be made in a lump sum, but rather "in accordance with the timetable and schedule contemplated for such payments, as though such termination had not occurred." *See, e.g.,* Stroud Contract Section 5(a)(i). And the required payments were, for four of the five executives, smaller in amount than those defined as "golden parachutes" under the Internal Revenue Code. But they nevertheless are the same in concept.

> Accordingly, the Court believes that the employment termination payment obligations here plainly are "golden parachutes." Indeed, the Executives have admitted in so many words that this is what they were. *See* Arg. Tr. 44 ("The first thing I would remind the court of is that these contracts were entered into in stages, and the golden parachutes, that is the multiplier of annual salary, was inserted in the contracts as an amendment when the company was up for sale").

17. *See* Stroud Contract Sections 5(a)(i)(A), 8(A), 6(c)(i).

18. *See, e.g.,* Gencarelli Contract Sections 5(a)(i)(A), 8(b), 5(c)(i).

19. Stroud Aff. ¶ 3.

tarily terminate his employment, was amended to provide, in relevant part:

> In addition to the foregoing, any resignation by Executive from his employment by the Company, whether or not with cause, as to which the Executive gives notice on or after the date six (6) months after, but not later than the first anniversary of, the closing of a transaction resulting in a Change of Control ... shall be deemed to be a termination by Employee of his employment with the Company for "good reason".... [20]

If employment were terminated within a year of a Change of Control (for any reason other than by the Company for "cause"), none of the Executives' original contracts, or, where applicable, any of their original contracts as amended, required the Executive to mitigate damages, or provided that any amounts earned in alternate employment would result in a reduction in amounts payable. To the contrary, each provided:

> If the Executive's employment is terminated within one year of a Change of Control for any reason other than by the Company for "cause", the Executive shall be [sic.] not be required to mitigate the damages provided by this [sic.] Section 5 of this Agreement by seeking substitute employment or otherwise and there shall be no offset by the Executive with respect to the payments and benefits set forth in this [sic.] Section 5 of this Agreement, except as otherwise qualified in Section 5(a)(iii).[21]

The annual salary to be paid "as compensation for the performance of [the Executive's] duties and obligations under [the Employment] Agreement" is outlined below: [22]

| Executive | Annual Salary | 2 × Salary | 4 × Salary | Payment Claim |
|---|---|---|---|---|
| Angelo Gencarelli | $160,000 | $320,000 | | $  320,000 |
| Denis Martin | $125,000 | $250,000 | | $  250,000 |
| Robert Mechur | $160,000 | $320,000 | | $  320,000 |
| Edward Siciliano | $175,000 | $350,000 | | $  350,000 |
| Danny Stroud | $250,000 | | $1,000,000 | $1,000,000 |
| Total | | | | $2,240,000 |

Finally, the Court notes that each Executive's employment contract had an integration clause, providing, among other things, that "[t]his Agreement constitutes the entire agreement by the Company and the Executive with respect to the subject matter hereof." [23]

*Sale Process and the Executives' Services*

In assertions of uncertain relevance to a claim for post-petition priority (and which, to the extent relevant, underscore the extent to which they provided consideration *pre-petition*), the Executives assert that for well over a year preceding the Debtor's filing date, they undertook diligent efforts

20. *See, e.g.,* Martin Contract Amendment Section 1b.

21. *See, e.g.,* Gencarelli Contract Section 5(c)(ii); Stroud Contract Section 6(c)(ii) (wording of relevant provision differs slightly, but not materially).

22. *See* each Employment Contract, Section 3(a).

23. *See, e.g.,* Gencarelli Contract ¶ 18.

to find a buyer for the Debtors' assets. During that period, the Executives say (and the Court accepts as true), that they contacted more than 50 potential purchasers, and sent letters of intent and/or draft acquisition documents to three of them. The Executives also worked with the Debtors' investment bankers, Daniels & Associates, prepared background and due diligence materials, attended numerous meetings and held conferences with potential purchasers. Although the Executives devoted much effort to selling the Debtors' businesses without filing for chapter 11, those efforts were ultimately unsuccessful.

However, immediately prior to the Filing Date, the Executives successfully completed negotiations for the sale of the Debtors' Internet access assets to Fastnet Corporation ("Fastnet") and Internet hosting assets to ClearBlue Technologies Corporation ("ClearBlue"). These completed negotiations later became the "stalking horse" bidders in section 363 sales that would take place after the filing of the Debtors' Chapter 11 cases.[24]

*The Sale Motions*

On April 23, 2002, six days after the Filing Date, the Debtors filed motions seeking approval to sell their Internet access business to an affiliate of Fastnet,[25] and their Internet hosting business assets to an affiliate of ClearBlue [26]—each as a stalking horse, subject to higher and better offers. After the Debtors filed their chapter 11 cases (presumably both before and after the filing of the two sale motions), the Executives continued to provide post-petition services, including preparing an on-line database, which included the "stalking horse" contracts and all other relevant information that would be useful to a potential purchaser of the Debtors' businesses in a section 363 sale.

During the course of the section 363 sale process, the Executives negotiated nondisclosure agreements with 21 interested parties, all of whom obtained access to documents regarding the Debtors from that database of information. The Executives then engaged in face-to-face discussions for the sale of the Debtors' businesses with at least 20 potential purchasers. Those discussions resulted in competitive bidding in both the section 363 sale of the Debtors' Internet access assets and the section 363 sale of the Debtors' Internet hosting assets. As a result of the successful section 363 bidding sale process, the amount realized for the Debtors' assets exceeded the "stalking horse" initial bids by more than $20 million.

During the section 363 sale process, the Executives continued to operate the Debtors' businesses in the ordinary course. They say, and once more the Court accepts as true, that they were able to retain the Debtors' employees, provide necessary assurances to customers of the ongoing viability of the Debtors businesses, and maintain the Debtors' other key relationships. They assert, and the Court accepts, that without the retention of such key clients, the stalking horse bids, as well as any potential competitive bids, would have been at risk.

---

**24.** Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

**25.** Debtor's Motion to Authorize Sale of Internet Access Business Assets to Fastnet Acquisitions Corp., Inc. (ECF # 32).

**26.** Debtor's Motion to Authorize Sale of Web Hosting and Internet Solutions Assets to Clearblue Technologies Management, Inc. (ECF # 37).

Throughout the entirety of their post-petition tenure with the Debtors, the Executives continued to receive their regular salaries.

By an order dated May 31, 2002, approximately six weeks after the Filing Date, the Court approved the sale of the Debtors' access business to Fastnet, and by an order dated June 11, 2002 (the "ClearBlue Sale Order"), approximately eight weeks after the Debtors' petition date, the Court approved the sale of the Debtors' hosting business to ClearBlue. Under the ClearBlue Sale Order, each of the Employment Contracts was deemed rejected as of the day after the closing, on or about June 12, 2002.[27] It further provided that the Executives would have 30 days after the rejection to file proofs of claim for any rejection damages or other claims any of them might have against the Debtors or their estates.[28] Three of the five Executives were hired to work for one of the purchasers of the Debtors' assets.[29]

As the Executives put it in their papers, "none of the Executives was 'terminated,' nor did any of them resign."[30] However, after the sale of substantially all of the Debtors' businesses in the two section 363 sales, none of the services previously rendered by the Executives was required by the Debtors.[31] "[T]he Debtors had no assets available with which to pay the Executives, and since it was clear that the Debtors were unwilling to pay the Executives, they ceased to render services to the Debtors."[32] As a result, the Executives contend, "[t]heir acts constituted a termination for 'good reason' because there was a 'material diminution' in their duties and responsibilities," entitling them to the "severance pay" provided in their employment contracts.[33]

### The "Stay–Put Bonuses" Motion

On April 20, 2002, three days after the their chapter 11 cases were filed, the Debtors filed a motion for an order authorizing the Debtors to pay "Stay–Put Bonuses" to five members of the Debtors' senior management.[34] The prospective recipients, referred to in that motion as the "Key Employees," are the same five Executives seeking relief here. The requested Stay–Put Bonuses, "geared to the severance provisions of the Key Employees' employment agreements with the Debtors,"[35] were of the same $2.4 million sought in their administrative expense claims. As described in the Stay–Put Bonuses Motion:

> Each Key Employee shall receive a bonus equivalent to the payment such Key Employee would receive upon termination of his employment in connection with or following a Change of Control transaction, as described in the Employment Agreements.[36]

The Creditors' Committee and the Secured Lenders objected to the Stay–Put Bonuses Motion, on numerous grounds, and during the course of the hearing on that motion, the Court expressed concerns with respect to it as well. In mid-hearing, the Stay–Put Bonuses Motion was withdrawn.

---

27. ClearBlue Sale Order (ECF # 145) ¶ 25.

28. *Id.*

29. *See* Arg. Tr. at 9.

30. Executives' Response (ECF # 327) ¶ 12.

31. *Id.*

32. *Id.*

33. *Id.*

34. ECF # 20 (the "Stay–Put Bonuses Motion").

35. *Id.* ¶ 19.

36. *Id.* ¶ 20.

## Discussion

The Executives contend that they are entitled to the sums they seek under the terms of their employment contracts, and also, apparently, based on a contention that the severance provisions contained in their Employment contracts "are severable from the employment provisions of the Employment Agreements",[37] and separately enforceable under *Straus–Duparquet.*[38] The contracts under which the Executives seek their compensation were executory contracts on the Filing Date, and were rejected on June 12, 2002. Determination of the Executives' entitlement to the sums they seek here requires consideration of:

(I) the Code provisions relating to executory contracts and claims for their breach, sections 365 and 502(g), and caselaw thereunder;

(II) the Code's requirements for allowance of administrative expenses, as set forth in section 503(b), and caselaw thereunder;

(III) caselaw (like *Straus–Duparquet*) decided under the now superseded Act, to the extent applicable; and

(IV) the Executives' contention that the contractual obligation to pay them the so-called "severance" can be separated from the remainder of their now-rejected contracts.

The Court addresses these in turn.

### I.

### A.

■ The principles applicable to claims under rejected contracts are familiar; not subject to serious dispute; and do not require discussion at length. A debtor-in-possession has the right, under section 365(a), to assume or reject any executory contract, subject to the court's approval.[39] If the debtor chooses to reject, that rejection, under section 365(g) of the Code, "constitutes a breach of such contract or lease," arising "immediately before the date of the filing of the petition."[40] Any claim arising from such a breach is treated as a prepetition general unsecured claim under section 502(g),[41] and is thus not entitled to administrative priority.[42]

■ Even in cases not involving real property leases (which have the more onerous obligations imposed under section

---

37. Executives' Response ¶ 14.

38. *Id.*

39. Section 365(a) provides, with exceptions not relevant here, that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

40. Section 365(g) provides, in relevant part:

(g) Except as provided in subsections (h)(2) and (i)(2) of this section [which are not relevant to this dispute], the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—
(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of

this title, immediately before the date of the filing of the petition . . .

41. Section 502(g) provides:

A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

42. *See Medical Malpractice Ins. Assn. v. Hirsch (In re Lavigne),* 114 F.3d 379, 387 (2d Cir.1997) ("The claim is treated as a *prepetition* claim, affording creditors their proper priority") (emphasis added).

365(d)(3) of the Code), "the ability to reject burdensome post-petition obligations is one of the most fundamental rights of a trustee or debtor-in-possession (and thus the creditor body generally) under the Bankruptcy Code." [43] And "the authority to reject an executory contract is vital to the basic purpose to a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization." [44]

### B.

■ The obligation the Executives seek to enforce was the obligation, set forth in Section 5(a) in each of their pre-petition contracts, to make payments to them of "Salary" [45] for the "Non–Compete Period" provided under section 8(b), "increase[d] by a factor of two." [46] Payments of that amount were to "be made in accordance with the timetable and schedule contemplated for such payments, as though such termination had not occurred." [47] By reason of that language, the contracts required the Debtors to pay the Executives their salary, as doubled or quadrupled, beginning and continuing for a period going into the future after the Executives' departure from the Debtors, and after the rejection of their employment contracts.

Thus the claims asserted here, at the risk of stating the obvious, arose directly, and solely, [48] from the Executives' now-rejected employment contracts.

Without dispute, the Executives' employment contracts—including, as relevant here, the alleged "severance" covenants arising under sections 5(a), 8(b) and 6(c)(i) of their contracts—were entered into prepetition. And without dispute, they were deemed rejected under the terms of the ClearBlue Sale Order on June 12, 2002. Thus, under section 502(g), any claims arising from the rejection of these prepetition contracts—most significantly, by reason of the Debtors' anticipatory breach, as a consequence of rejection, of their duty to continue to make the payments required under section 5(a), became, by statute—sections 365(g) and 502(g)—general unsecured claims. [49]

■ It would frustrate the entire purpose of granting debtors the power to reject burdensome executory contracts if, despite choosing to reject, they were nonetheless saddled with an administrative expense corresponding to the burdensome obligation they sought to avoid, [50] and sections 365(g) and 502(g) collectively work together to avoid that result, and to avoid the resulting prejudice to other creditors. Thus, by statute and caselaw, the damages

---

43. *See In re Ames Department Stores, Inc.*, 306 B.R. 43, 52 (Bankr.S.D.N.Y.2004) (Gerber, J.)

44. *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

45. *See, e.g.,* Siciliano Contract Section 5(a)(i)(A).

46. *See, e.g., id.* Section 6(c)(i).

47. *See, e.g., id.* Section 5(a)(i).

48. It will be remembered that each contract had an integration clause, providing that the written agreement "constitute[d] the entire agreement by the Company and the Executive

with respect to the subject matter hereof." *See* page —— above.

49. *See, e.g., Ames,* 306 B.R. at 59–60 & n. 57 (claims for breach of obligation to clean up leased premises, arising at termination of lease, gave rise, after rejection, to *pre-petition* claims, citing, *inter alia, Lavigne* ).

50. *Cf. Ames,* 306 B.R. at 52 ("It would frustrate the entire purpose of rejection if, in order to reject and thereby be relieved of a burdensome executory contract, the debtor were required, as a condition to doing so, to comply with one of the very aspects of the agreement that is burdensome").

for breach—including for failures to satisfy future obligations under the rejected contracts—gave rise to pre-petition, general unsecured, claims.

That basic principle has been recognized, and applied, in numerous cases denying administrative expense treatment to claims by executives for so-called "severance" payments—whether or not characterized as "golden parachutes"—under rejected employment contracts.[51]

## II.

■ The fact that the Debtors rejected the contracts at issue here would be dispositive of the matter before the Court if it were not for two remaining matters. The first[52] is that although any claim arising from the debtor's rejection of an executory

contract is treated as arising pre-petition and giving rise to a pre-petition claim, the nondebtor party may nonetheless be entitled to administrative priority for any uncompensated-for benefits received by the debtor prior to rejection.[53]

### A.

Section 503(b) allows administrative expense treatment for "the actual, necessary costs and expenses of preserving the estate ... for services rendered after the commencement of the case."[54] Code section 507(a)(1) grants a first priority claim on the estate's assets, ahead of the claims of unsecured creditors, to administrative expenses allowed under section 503.

■ The Second Circuit, in a decision of considerable importance to the issues

---

**51.** *See In re FBI Distribution Corp. v. Official Comm. of Unsecured Creditors*, 330 F.3d 36, 39 (1st Cir.2003) (*"Filene's Basement"*) (affirming rulings by bankruptcy court and district court determining that former executive was not entitled to administrative expense treatment for the sums due under her employment contract, where the agreement "was essentially a **golden parachute,** which, in general terms, provided that should [the executives] employment terminate following a qualifying Change in Control, she would receive three years' salary plus other benefits"). As the First Circuit there stated:

> If the contract is rejected, on the other hand, the contract is deemed breached on the date "immediately before the date of the filing of the petition," 11 U.S.C. § 365(g)(1), and the nondebtor party has a prepetition general unsecured claim for breach of contract damages, *one not entitled to administrative priority* ....

*Id.* at 42 (emphasis added). *See also In re Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687 (Bankr.S.D.N.Y.1992) (*"Drexel Burnham"*) (Conrad, J.); *In re Hooker Investments, Inc.,* 145 B.R. 138 (Bankr.S.D.N.Y. 1992) (*"Hooker"*) (Beatty, J.); *In re Crystal Apparel, Inc.,* 220 B.R. 816 (Bankr.S.D.N.Y. 1998) (*"Crystal Apparel–Bankruptcy"*) (Beatty, J.); *CFS–Bankruptcy,* 233 B.R. at 893 & n. 7.

**52.** The second is the Executives' argument that the severance provisions of the Employment Contracts are severable from the employment provisions, and are therefore enforceable despite rejection of those contracts. In part based on that contention, they seek not just administrative priority for the benefit provided to the estate pending the Debtors' decision to assume or reject, but rather seek administrative priority for the *entire* severance amount allegedly due under their employment contracts. That contention is discussed in Section IV below.

**53.** *See Hooker,* 145 B.R. at 144; *Drexel Burnham,* 138 B.R. at 714–715.

**54.** Section 503, in relevant part, reads:
> § 503. Allowance of administrative expenses.
> (a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
> (b) After notice and a hearing, there shall be allowed, administrative expenses, other than claims allowed under section 502(f) of this title, including—
> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case....

here,[55] has noted the importance of equal distribution amongst creditors, and the need to ensure compliance with the requirements for statutory priorities (such as those granted to administrative expenses, the issue it faced there and this Court faces here) before departing from that general rule. "Because the presumption in bankruptcy cases is that the debtor's limited resources will be equally distributed among his creditors, statutory priorities are narrowly construed."[56] And relying on long established Supreme Court authority, the Second Circuit continued: "[i]f one claimant is to be preferred over others, the purpose should be clear from the statute."[57]

Thus, "[a] debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate."[58] Rather, for an expense to be given administrative expense status, *McFarlin's* requires that two elements must be satisfied:

[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession, and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business."[59]

Countless other courts have held similarly.[60]

---

**55.** *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 99–100 (2d Cir.1986) (*"McFarlin's"*) (affirming denial by district court, which in turn had affirmed the denial by the bankruptcy court, of request for administrative expense priority, for failure to satisfy the section 503(b) requirements).

**56.** *Id.* at 100.

**57.** *Id.* at 101 (*quoting Nathanson v. N.L.R.B.*, 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952)). In the same vein, the burden of proving an entitlement to an administrative expense priority lies with the party seeking administrative expense status. *See, e.g., Drexel Burnham*, 134 B.R. at 489.

**58.** *McFarlin's*, 789 F.2d at 101.

**59.** *Id.* (citations omitted) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976) (*"Mammoth Mart"*)); *accord Filene's Basement*, 330 F.3d at 42–43 ("Where the debtor in possession, however, induces a nondebtor to render performance pursuant to an *unassumed* prepetition executory contract, pending its decision to reject or assume, the nondebtor party will be entitled to administrative priority only to the extent that the consideration supporting the claim was supplied to the debtor in possession during the reorganization and was beneficial to the estate") (emphasis in original).

**60.** *See e.g., Filene's Basement.*, 330 F.3d at 42–43; *In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 535–36 (3d Cir.1999); *In re Sunarhauserman, Inc.*, 126 F.3d 811, 816 (6th Cir.1997); *In re Amarex*, 853 F.2d 1526, 1530–32 (10th Cir.1988); *In re Jartran, Inc.*, 732 F.2d 584, 586–87 (7th Cir.1984); *In re Health Maintenance Foundation*, 680 F.2d 619 (9th Cir.1982); *In re Enron Corp.*, 279 B.R. 695, 705 (Bankr.S.D.N.Y.2002); *In re Jamesway Corp.*, 235 B.R. 329, 347–48 (Bankr.S.D.N.Y.1999); *Vanco Trading, Inc. v. Monheit*, 1999 WL 464531, at *2 (D.Conn. June 17, 1999); *In re Patient Educ. Media, Inc.*, 221 B.R. 97, 101 (Bankr.S.D.N.Y.1998); *In re Keene Corp.*, 208 B.R. 112, 115 (Bankr. S.D.N.Y.1997); *In re Olga Coal Co.*, 194 B.R. 741, 746 (Bankr.S.D.N.Y.1996); *In re Houbigant, Inc.*, 188 B.R. 347, 355 (Bankr.S.D.N.Y. 1995); *In re K Chemical Corp.*, 188 B.R. 89, 94 (Bankr.D.Conn.1995); *In re R.H. Macy & Co.*, 170 B.R. 69, 76 (Bankr.S.D.N.Y.1994); *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 160 B.R. 882, 889 (Bankr.S.D.N.Y.1993); *In re CIS Corp.*, 142 B.R. 640, 643 (S.D.N.Y.1992); *In re New York Trap Rock Corp.*, 137 B.R. 568, 572 (Bankr.S.D.N.Y.1992); *In re Drexel Burnham Lambert Group Inc.*, 134 B.R. 482, 487–88 (Bankr.S.D.N.Y.1991); *In re Chateaugay Corp.*, 102 B.R. 335, 353 (Bankr.S.D.N.Y. 1989); *In re Amfesco Industries, Inc.*, 81 B.R. 777, 784 (Bankr.E.D.N.Y.1988); *In re Davidson & McKirdy Co.*, 70 B.R. 38, 40 (Bankr. D.Conn.1987); *In re Keegan Utility Contrac-*

## B.

■ As noted above,[61] the counterparty to a rejected executory contract may nonetheless be entitled to administrative priority for any uncompensated-for benefits received by the debtor prior to rejection. But with exceptions not relevant here (except to note that Congress did not make the exceptions broader),[62] "the terms of the pre-petition contract do not determine the amount of the priority .... nor does the contract become enforceable against the debtor in possession simply because it elects to receive benefits under the contract after the filing date." [63] Rather, as the Supreme Court instructed in *Bildisco:*

> If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay *for the reasonable value of those services,* which, depending on the circumstances of a particular contract, may be what is specified in the contract.[64]

■ The Court does not need to decide, and does not decide, whether the Executives' post-petition services to the Debtors, which had their origins in a pre-petition relationship with the Debtors, satisfy the first of the *McFarlin's* requirements, that of a transaction between the creditor and the trustee or debtor in possession. For the Executives' claimed right, in addition to their salaries, to continuation of their salaries, doubled or quadrupled, after their departure from the Debtors, fails the second of the *McFarlin's* requirements, that "the consideration supporting the claimant's right to payment [be] ... beneficial to the debtor-in-possession in the operation of the business." Even more clearly, the claimed right fails to meet *Bildisco's* requirements, which limit the estate's exposure to "the reasonable value of those services."

As a fair number of other courts have done,[65] this Court will examine the nature of the consideration provided by the employee, but in this Court's view, the relevant cases, particularly *Bildisco,* make the

---

*tors, Inc.,* 70 B.R. 87, 89 (Bankr.W.D.N.Y. 1987); *In re Baths Intern., Inc.,* 25 B.R. 538, 540 (Bankr.S.D.N.Y.1982).

**61.** *See* page 237, *supra.*

**62.** *See* Code sections 365(d)(3), with respect to a debtor-tenant under a lease of commercial real estate, and 365(d)(10), with respect to a debtor-lessee under a lease of commercial personal property, imposing the duty on the debtor-tenant or debtor-lessee to pay the bargained-for rent irrespective of the benefit to the estate.

**63.** *Filene's Basement,* 330 F.3d at 43.

**64.** 465 U.S. at 531, 104 S.Ct. 1188 (emphasis added) (citations omitted); *accord Filene's Basement,* 330 F.3d at 43–44 (*quoting Bildisco* and applying the rule to a golden parachute contract).

**65.** *See Filene's Basement,* 330 F.3d at 46 (denying administrative priority to claim for "severance pay", on the ground that the consideration supporting the claim was the agreement to forgo other employment opportunities, which was supplied entirely at the time of the execution of the employment agreement); *Bachman v. Commercial Financial Services (In re Commercial Financial Services),* 246 F.3d 1291, 1294–95 (10th Cir. 2001) ("*CFS–Circuit*") (same); *In re Phones for All, Inc.,* 249 B.R. 426, 430 (Bankr. N.D.Tex.2000) (Felsenthal, J.) (same), *aff'd* 262 B.R. 914 (N.D.Tex.2001), *aff'd* 288 F.3d 730 (5th Cir.2002); *In re Nomus–American, Inc.,* No. 01–50255 11, 2002 WL 230701, at *2 (Bankr.M.D.N.C. Feb.8, 2002) (same); *In re M Group, Inc.,* 268 B.R. 896, 901–902 (Bankr.D.Del.2001) (same); *In re Cincinnati Cordage & Paper Co.,* 271 B.R. 264, 267–69 (Bankr.S.D.Ohio 2001) (same); *In re Uly–Pak, Inc.,* 128 B.R. 763, 768 (Bankr.S.D.Ill.1991) (same).

more appropriate inquiry the post-petition pre-rejection *benefit to the estate*—and the extent, if any, to which the consideration already paid to the Executive (full salary, through the post-petition pre-rejection period) falls short of that amount.

Turning first to the nature of the consideration, this Court sees it just as numerous other courts have, including the First Circuit and Tenth Circuits.[66] In *Filene's Basement,* for example, when analyzing identical golden parachute obligations, and concluding that administrative expense treatment of the "severance" payment would be improper, the First Circuit stated:

> We hold that the consideration supporting Mason's claim for severance benefits was not being an employee in good standing at the time of the discharge, but rather her agreement to forgo other employment opportunities (in this case, her agreement to forgo her high-paying position at Home Goods, Inc.), which she provided prepetition to the debtor the moment she signed the Employment Agreement in May 1999.[67]

The First Circuit added, in analysis no less applicable here:

> Unlike severance or vacation benefits geared to length of service—benefits that clearly constitute a part of an employee's wages for services rendered— the severance benefits here do not constitute any part of her compensation for services rendered. Whether she worked two minutes or thirty-five and one-half months after executing the Employment Agreement, she was entitled to in excess of $1.2 million if she were terminated without cause.... Her compensation for services rendered simply did not include severance pay.[68]

Looking at the request in *Bildisco* terms, focusing on the value to the estate, the Executives do no better. Here, the Executives and the Debtors fixed amounts in each of their contracts—equal to the salary, bonuses (if earned), and current fringe benefits—based on their shared perceptions of what the Executives' services were worth for as long as they were working. While those perceptions are not dispositive or binding on the Court with respect to the reasonable value of the Executives' services, they are probative,[69] and the Court here assumes them to be mutually fair in the absence of evidence to the contrary. But significantly, if the Executives did not leave the Debtors' employ, *they would receive no more.* The salary continuation (putting aside its doubling or quadrupling) was not an indication of the value of their work; it was rather, in substance, a species of damages,[70] liquidated

---

66. See n. 65 above

67. 330 F.3d at 46. In *CFS–Circuit* (also holding administrative expense treatment to be unwarranted), the Tenth Circuit came to the same conclusion, see 246 F.3d at 1295, and also noted a second kind of consideration (present here as well), which it likewise found to be pre-petition consideration. *Id.* ("The consideration supporting appellants' right to the lump sum cash payments was the mutual promises contained in their respective employment contracts. That consideration was rendered entirely pre-petition and cannot support appellants' claim for administrative priority").

68. 330 F.3d at 46–47 (citation and footnote omitted).

69. *See Filene's Basement,* 330 F.3d at 44 ("Although the Employment Agreement may be probative of the reasonable value, it is not the dispositive measure").

70. *See Hooker,* 145 B.R. at 147–148 (so concluding, after parsing the obligation there); *Crystal Apparel–Bankruptcy,* 220 B.R. at 836 & n. 12 ("Because the contract provision [in *Hooker* ] was actually liquidated damages and not 'severance' as that term has been developed by the Second Circuit case law, it was

or otherwise (albeit arguably dispropor-tionate to any resulting actual damage),[71] for action on the part of the Debtors that caused an Executive's regular draw of salary to come to an end—either because of a breach of his employment contract by the Debtors, or a change in the Executive's working conditions justifying his departure for "Good Reason", or for entering into a transaction with an entity with whom the Executive might not have a future.

The salary continuation—even before its doubling or quadrupling—was indeed a promise on the part of the Debtors (which is why the Executives would presumptively be entitled to the allowance of pre-petition claims for it, subject to any caps on allowance Congress imposed), but it was not a measure of the value of the services the Executives provided to the estate. While the Executives introduced proof that during the time they remained employed by the Debtors (including during the postpetition prerejection period), they provided valuable services, they introduced no proof that their salaries were less than a fair exchange for the work they performed during that time, and, in particular introduced no proof that there was any nexus between (a) the doubled or quadrupled compensation they would receive for *not* working and (b) the value of the services they provided when they *were*.

In analyzing the Executives' entitlement, if any, to further compensation, as an administrative expense, in light of the Debtors' rejection of their contracts, the Court returns to the basic question—the extent, if any, to which the salary paid and other benefits then provided fell short of the reasonable value of the services provided by the Executives during their postpetition prerejection tenure with the Debtors. And once more, the analysis of the First Circuit in *Filene's Basement* is compelling:

> Of course, [the former executive] Mason is entitled to receive the reasonable value of the beneficial services rendered during the reorganization. For these services, she was fully compensated by the debtor in possession: she received her full salary plus fringe benefits pursuant to the terms of her Employment Agreement for all the services she rendered postpetition. Absent a court approved assumption of her Employment Agreement, this was all she is entitled to receive.[72]

### III.

The two-part test outlined above is the standard almost always applied in this Circuit[73] for determining whether a claim is

---

not accorded priority as an administrative expense").

**71.** *See Hooker,* 145 B.R. at 148 ("[I]f there is any unfairness, penalty or coercive effect in Paragraph 5(c) of the Contract it is as to the Debtors and not the Claimant").

**72.** 330 F.3d at 48 (footnote omitted); *accord CFS–Circuit,* 246 F.3d at 1296 ("[T]he salaries paid appellants fully compensated them for their post-petition services to the debtor in possession").

**73.** *McFarlin's,* 789 F.2d at 101; *In re Enron Corp.,* 279 B.R. at 705; *In re Jamesway Corp.,* 235 B.R. at 347–48; *Vanco Trading, Inc. v.*

*Monheit,* 1999 WL 464531, at *2; *In re Patient Educ. Media, Inc.,* 221 B.R. at 101; *In re Keene Corp.,* 208 B.R. at 115; *In re Olga Coal Co.,* 194 B.R. at 746; *In re Houbigant, Inc.,* 188 B.R. at 355; *In re K Chemical Corp.,* 188 B.R. at 94; *In re R.H. Macy & Co.,* 170 B.R. at 76; *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey,* 160 B.R. at 889; *In re CIS Corp.,* 142 B.R. at 643; *In re New York Trap Rock Corp.,* 137 B.R. at 572; *In re Drexel Burnham Lambert Group Inc.,* 134 B.R. at 487–88; *In re Chateaugay Corp.,* 102 B.R. at 353; *In re Amfesco Industries, Inc.,* 81 B.R. at 784; *In re Davidson & McKirdy Co.,* 70 B.R. at 40; *In re Keegan*

entitled to administrative priority under section 503 of the Code. However, in *Straus–Duparquet, supra,* decided under the now superseded Bankruptcy Act, the Second Circuit approved administrative expense priority for the allowance to union employees of two weeks' severance pay, due to them under an unrejected collective bargaining agreement. The *Straus–Duparquet* court reasoned that "[s]ince severance pay is compensation for termination of employment and since the employment of these claimants was terminated as an incident of the administration of the bankrupt's estate, severance pay was an expense of administration and is entitled to priority as such an expense." [74]

In two other cases, decided under the now superseded Act, *Unishops* and *W.T. Grant, supra,* the Second Circuit followed its *Straus–Duparquet* decision. In its later decision, under the Code, in *McFarlin's,* the Second Circuit articulated the modern two-pronged test that is now almost always used for administrative expense payment requests, but as the Second Circuit found *Straus–Duparquet* easily distinguishable, it decided *McFarlin's* on that narrower ground, and declined, though requested, to overrule *Straus–Duparquet,* or to declare that *Straus–Duparquet* had been legislatively overruled.

Based on the three earlier Act cases of *Straus–Duparquet, Unishops* and *W.T. Grant,* the Executives argue that their claims, for multiple years' salary under rejected employment contracts, are likewise entitled to administrative status, because their claims too qualify as "severance pay." But those cases all are easily distinguishable. *Straus–Duparquet* and *W.T. Grant* are distinguishable on the ground that this case involves a very different type of so called "severance," and all three are distinguishable on the ground that none involved a rejected employment contract, subject to the statutory provisions relating to claims allowance of sections 365(g), 502(g), and 502(b)(7).

### A.

In its brief decision in *Straus–Duparquet,* the Second Circuit defined severance as:

> a form of compensation for the termination of the employment relation, for reasons other than the displaced employees' misconduct, primarily to alleviate the consequent need for economic readjustment but also to recompense him for certain losses attributable to the dismissal.[75]

The policy behind severance pay is to "protect employees from the economic hardship of joblessness, and reward them for past services to their employer." [76] The payments commonly are of an amount up to a few weeks' pay—where they fairly can be regarded as continued pay in lieu of notice.

However, while the payments sought by the Executives were labeled as "*Severance* upon a Change of Control," [77] this is at best a play on words. As noted in *Drexel Burnham,* "[t]o allow [the] claim merely because the contract calls it a 'severance' payment would elevate form, which may

---

*Utility Contractors, Inc.,* 70 B.R. at 89; *In re Baths Intern., Inc.,* 25 B.R. at 540.

74. 386 F.2d at 651.

75. *Straus–Duparquet,* 386 F.2d at 651 (quoting *Adams v. Jersey Central Power & Light Co.,* 21 N.J. 8, 120 A.2d 737, 740 (1956)).

76. *In re Jamesway Corp.,* 199 B.R. at 840 (citing *Bradwell v. GAF Corp.,* 954 F.2d 798, 801 (2d Cir.1992)).

77. *See, e.g.,* Stroud Contract Section 6(c) (emphasis added).

sometimes have substance, over a substance which is as to this issue as substantial as an elephant." [78]

In *Straus–Duparquet,* claims of employees that were employed for at least one year, but not more than three years, were entitled to one week's pay as severance. Employees employed more than three years were entitled to two weeks' pay as severance.[79]  Similarly, in *W.T. Grant,* employees were awarded severance pay based upon their length of employment, and, depending on that length, their severance claims were typically for one or two weeks' pay.[80]

But here, as noted above, the obligations arose in employment contracts entered into pre-petition, where the consideration was an array of promises going in each direction, one of which was an employer promise to pay salary for two or four *years* after an Executive's departure, under certain conditions—which included *voluntary* departure, and the other of which (change of control) was a future contingency which might or might not result in economic hardship.[81]  And not only was the obligation not based, in any way, on the Executive's ability or inability to get a substitute job; it expressly provided, in no uncertain terms, that if there were a change of control, there was no duty on the part of the executive to mitigate.  Nor was a payment obligation of that length in lieu of notice.

Here the so called "severance" obligation in the Executives' employment contracts, in each of its purpose, nature, and magnitude, is fundamentally different than the "severance" whose payment was approved in *Straus–Duparquet* and *W.T. Grant.*

### 1.  Purpose.

Perhaps the most significant indication that the payments here were not "severance" as envisioned in *Straus–Duparquet* is with respect to their purpose.  They were not particularly to compensate for the economic hardship of job loss or for an employer decision to terminate employment—as they were payable, under many circumstances, even if the Executive chose to leave, and they were expressly made not dependent on mitigation, or the ability or inability to get another job.

They were, rather, an incentive for the Executive to *remain* with the employer,[82] at a time when other provisions of his

---

78.  *Drexel Burnham,* 138 B.R. at 711.  *See also Liona Corp., N.V. v. PCH Assocs. (In re PCH Assocs.),* 804 F.2d 193, 198 (2d Cir.1986).

79.  386 F.2d at 650.

80.  See the district court decision in *W.T. Grant, In re W.T. Grant Co.,* 474 F.Supp. 788, 790 (S.D.N.Y.1979) (Duffy, J.), *aff'd,* 620 F.2d 319 (2d Cir.1980).

81.  In *Crystal Apparel,* Judge Beatty concluded that a golden parachute "is not severance as the Second Circuit has come to use the term severance, as a term of art, in its decisions in this area."  220 B.R. at 836.  The claim at issue in *Crystal Apparel* was, as in the present case, a change of control payment that was not based on length of service, and amounted to 2.99 times the claimants' base salary.  Examining the Second Circuit's precedent in this area, Judge Beatty concluded that the Circuit "has yet to decide a case on the issue of whether a pre-petition 'golden parachute' becomes an expense of administration simply by virtue of the employee's post-petition continuation as an employee."  *Id.*

82.  As admitted by the Executives in their employment contracts, the amendments to the Employment Agreements were entered into "in consideration of the employment and the continued employment of the [Former] Executive by the Company, and in order to induce the [Former] Executive to remain employed by the Company in the event of a 'Change of Control Event.' "  *See, e.g.,* Martin Amendment.

employment contract gave him the option to leave.[83] That is not necessarily a bad thing, but it is not at all the same purpose as one to compensate an employee for the economic hardship of his forced dismissal, or to reward him for years of past service.

### 2. Nature.

The "severance" obligation here was also different in nature. As long as the employment contract was in place, and the condition was satisfied, the Executive would have to be paid his two (or four) years salary, long after he departed from, and was no longer providing services to, his employer. The severance obligation did not vary with the time of service; it was payable in full from the time the two sides signed the Executive's employment contract, even if the change of control (or other circumstance constituting "Good Reason") took place five minutes after the contract's execution. Thus the "severance" obligation in the Executive's contract with the Debtors did not rest on the length of his service, like traditional severance pay.[84] Rather, it was a promise of future payment in the event of a contingency.[85]

■ The promise to make post-termination payments, made pre-petition, was another form of pre-petition consideration

**83.** See Hooker, 145 B.R. at 150 ("the provision for the payments seems designed more to encourage the Debtors to retain the Claimant than to protect the Claimant from the economic hardship of joblessness").

**84.** As the First Circuit noted in Filene's Basement, declining to award administrative expense priority to an executive's claim for "severance" under her employment contract: "[u]nlike severance or vacation benefits geared to length of service," the severance benefits at issue were not "compensation for services rendered." 330 F.3d at 46–47. This is because "[w]hether [the executive] worked two minutes or thirty-five and one-half months after executing the Employment Agreement, she was entitled to in excess of $1.2 million if she were terminated without cause . . . regardless of whether she rendered any services whatsoever." Id. at 47.

See also Hooker, 145 B.R. at 149–50 (factor in court's conclusion that claims were not severance pay was that the size of the payment was inversely related to the length of employment), In re Jamesway Corp., 199 B.R. at 841 (finding that the claims at issue lacked typical characteristics of severance pay, including that the payments "decrease during the first year of the Employment Term"); In re Enron Corp., 300 B.R. 201, 216 (Bankr.S.D.N.Y.2003) ("The Termination Payment cannot be regarded as a reward for past service to the Company, since the amount of such payment decreases the longer Claimant is employed"); Crys-

tal Apparel, 220 B.R. at 836 (concluding that a golden parachute was "not severance as the Second Circuit has come to use the term severance, as a term of art, in its decisions in this area," where a change of control payment was not based on length of service, and amounted to 2.99 times the claimants' base salary). Examining the Second Circuit's precedent in this area, the Crystal Apparel court noted that the Circuit "has yet to decide a case on the issue of whether a pre-petition 'golden parachute' becomes an expense of administration simply by virtue of the employee's post-petition continuation as an employee." Id. Compare In re Spectrum Information Technologies, Inc., 193 B.R. 400 (Bankr.E.D.N.Y. 1996), following Straus–Duparquet, Unishops and W.T. Grant where the severance payment was tied to the length of the Executive's service (and the employment contract had not been timely rejected). In the Court's view, Hooker, Jamesway, Enron and Crystal Apparel, in this district, are better reasoned than the only case in this district that could be read as ignoring the length of service distinction, In re Ralph Lauren Womenswear, Inc., 197 B.R. 771, 777 (Bankr.S.D.N.Y.1996) (holding, in estimating former executive's claim for purposes of voting on plan, that even though payments were not based on length of service they "fit[ ] well into the classic definition of severance pay").

**85.** Crystal Apparel, 220 B.R. at 821 n. 2.

provided to each Executive at the time he entered into the contract. The undertaking to pay "severance" if the Executive chose to quit (if accompanied by the condition of a change of control or other "Good Reason"), or if the Executive was dismissed for other than "Cause," was a pre-petition promise that created a contingent liability on the part of the Debtors to make that payment if the condition was satisfied. Though contingent, it was a claim on the Filing Date.[86] It is basic bankruptcy law that a pre-petition promise to satisfy an obligation upon the happening of a later condition is not transmogrified into a post-petition obligation when the condition is satisfied post-petition. Instead, it is simply a pre-petition contingent claim.[87]

The *In re Phones for All* court, ultimately affirmed by the Fifth Circuit, held that the severance payment at issue was "earned" pre-petition, when the employment contract was entered into.[88] Thus, the *Phones for All* court concluded, "[u]nder the terms of this contract, the Second Circuit would therefore apparently consider the severance pay to have been earned pre-petition and thus not be entitled to administrative expense priority."[89] The Fifth Circuit, when it affirmed the district court, which in turn had affirmed the bankruptcy court's decision, observed that because the claimant "'earned' his severance pay when he entered into the contract .... *even the Second Circuit cases would not accord his claim priority status.*"[90]

### 3. Magnitude.

The magnitude of the "severance" claims here further distinguishes them from the severance in *Straus–Duparquet* and *W.T. Grant*. The Executives are seeking two years' (and in one case, four years') base salary. In *Straus–Duparquet*, the former

---

86. Bankruptcy Code section 101(5), which defines claims, provides, in relevant part:

("[C]laim") means—
(A) *right to payment, whether or not such right is* reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, *unmatured*, disputed, undisputed, legal, equitable, secured, or unsecured....
(Emphasis added).

87. *See, e.g., United States v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997, 1004–1005 (2d Cir.1991) *("LTV")* ("[i]n the context of contract claims, the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created'") (quoting *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd mem.*, 646 F.2d 193 (5th Cir.1981)); *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir.1997) (a contingent claim within the meaning of section 101(5) is a debt that "does not become an obligation until the occurrence of a future event, but is noncontingent when all of the events giving rise to liability for the debt occurred prior to the debtor's filing for bankruptcy"); *Riverwood Intl. Corp. v. Olin Corp. (In re Manville Forest Products Corp.)*, 225 B.R. 862, 866–867, 868 (Bankr.S.D.N.Y.1998) (Lifland, C.J.) *("LTV* provides a bright line test for determining whether a contractual contingency claim accrued. Was this a pre-petition obligation of the Debtor that will become due upon the happening of some future event? Was the future event within the actual or presumed contemplation of the parties at the time the original relationship was created?"; applying that principle to find an indemnity obligation to be a pre-petition claim (and hence discharged by confirmation), when the promise was made pre-petition, but the circumstances triggering the indemnification obligation arose post-petition).

88. *In re Phones for All, Inc.*, 249 B.R. 426, 429–430 (Bankr.N.D.Tex.2000).

89. *Id.* at 430.

90. *Lasky v. Phones for All, Inc. (In re Phones for All, Inc.)*, 288 F.3d 730, 732 (5th Cir.2002) (emphasis added).

employees were seeking at most *two weeks* severance pay.[91] Payments for the duration and in the amount sought here far exceed the amounts necessary to compensate for the economic hardship of temporary joblessness, and in no way can be fairly regarded as "in lieu of notice".[92] As the *Drexel Burnham* court noted, comparing facts like those here to those in *Straus–Duparquet,* "[a] claim for two weeks' pay is different, not just in degree, but in kind, from a claim for three years' salary and bonuses. The fact that a claim for the former was allowed is no authority for allowing the later." [93]

Because these payments are not the same kind of "severance pay" whose payment was authorized by the Second Circuit

in *Straus–Duparquet* and *W.T. Grant,* those cases do not provide authority for granting them administrative priority.

### B.

Additionally, each of *Straus–Duparquet, Unishops* and *W.T. Grant* is distinguishable in that none involved a written agreement that had been rejected. As previously noted, unperformed future obligations under executory contracts give rise to *pre-petition claims,* not administrative expenses. And in fact, when the executory contract with unperformed future obligations is an employment contract, section 502(b)(7) of the Code even caps the recovery on pre-petition claims arising from its termination.[94]

---

91. *Straus–Duparquet,* 386 F.2d at 650.

92. That this policy behind severance payments is not furthered is particularly evident here, where three of the five Executives are employed by the entity that purchased the Debtors' business and triggered the change in control provisions. *See* Arg. Tr. at 9.

93. *Drexel Burnham,* 138 B.R. at 711. The Drexel Burnham court also distinguished *Unishops,* in which the Second Circuit permitted a $100,000 severance pay for the debtor's chief executive officer, based on the circuit's reliance on rejection provisions under the former Act that have been changed under the Code. *See* Section III(B) below.
    *See also Hooker,* 145 B.R. at 150 ("Whatever vitality a judicially created *per se* rule relative to severance pay might once have had and may continue to have when applied to ordinary at-will and non-union employees, such a *per se* rule has no continuing vitality when applied to high-powered, high-priced executives with individually negotiated contracts providing for substantial termination payments"); *Crystal Apparel,* 220 B.R. at 836 (finding the Second Circuit's decisions in this area, which with one exception, concerned rank and file employees, to be "inappropriate in the current climate of rapidly increasing corporate executive salaries"); *Dullanty v. Selectors, Inc. (In re Selectors, Inc.),* 85 B.R. 843, 846 (9th Cir. BAP 1988) ("[A]s a policy matter,

a parachute clause like one here should not give rise to an administrative expense. To so hold would allow employers contemplating bankruptcy to insert such clauses in employment contracts thereby favoring certain employees at the expense of legitimate creditors").

94. Bankruptcy Code section 502(b) provides, in relevant part (and with exceptions not relevant here):

(b) [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

. . .

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—a

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates . . .

As noted earlier, the Debtors rejected the Employment Agreements at issue here. This is a crucial distinction from the Second Circuit's pre-Code trilogy,[95] because, as noted above, under sections 365(g) and 502(g), claims arising from the rejection of an executory contract are treated as pre-petition claims.

The distinction is particularly significant with respect to *Unishops*, the only one of the trilogy that involved an executive's employment contract. The Second Circuit there expressly based its decision on the distinction from the case presented here. There, the Second Circuit approved the payment, as an administrative expense, of $100,000 to an executive, one Zelin, under an employment agreement on the termination of his employment eight months after the filing of the Debtor's chapter XI filing. But the *Unishops* court disapproved a conclusion by the district court that the employment contract had been rejected by implication,[96] and emphasized that *"[n]o attempt was made by this debt-*

*or to disaffirm its executory contract with Zelin."* [97]

The same distinction was made in *W.T. Grant*, even though that involved a collective bargaining agreement, applicable to numerous employees, and not an executive's employment contract. Dealing with the severance claims asserted by the many terminated employees, the *W.T. Grant* court identified, as one of the two "dispositive questions on appeal," "whether Grant, as debtor-in-possession, rejected the executory contracts of its employees...." [98] It held that Grant had not.[99] It rejected the *W.T. Grant* trustee's contention that Grant had rejected the executory contracts by posting notices in its stores that it was discontinuing the severance pay benefits, emphasizing that "only a formal rejection ... is sufficient to disaffirm an executory contract." [100]

### IV.

█ Finally, the Executives' contention that the obligation to pay them "sever-

---

This change is "indicative of the Congress's effort to regulate the extent to which employee contract claims could recover from the estate at the expense of other creditors." *Ralph Lauren,* 197 B.R. at 776 (discussing *Hooker,* 145 B.R. at 145–46).

**95.** The courts in *W.T. Grant* and *Unishops* noted explicitly that the contracts there had not been rejected. The short *Straus–Duparquet* opinion did not explicitly say, but there is no indication in the decision that the contract had been rejected, and the decision is devoid of discussion of the consequences of rejection. The plain implication is that it had not been.

**96.** 553 F.2d at 307–308 (disapproving district court conclusion that because there had been no court approval of the agreement, it had been rejected, stating "[a] debtor in possession under Chapter XI may disaffirm or reject an executory agreement only in accordance with the statutory procedures.")

**97.** *Id.* at 308 (emphasis added).

**98.** 620 F.2d at 321.

**99.** *Id.*

**100.** *Id.* (citation to Section 313(1) of the now superseded Bankruptcy Act omitted). Thus, with respect, the Court cannot agree with the statements in *In re Child World, Inc.,* 147 B.R. 847 (Bankr.S.D.N.Y.1992), that:

> the rule in the Second Circuit has always been that a debtor's post-petition *rejection* of an executory contract for severance pay is a first priority administrative expense in its entirety because it is compensation for the event of termination and, unlike wages, does not accrue on a *per diem* basis."

*Id.* at 851 (emphasis added) (citing *W.T. Grant, Unishops* and *Straus–Duparquet*). As noted above, the courts in each of *W.T. Grant* and *Unishops* emphasized that the contracts there had *not* been rejected (in each case explaining why), and while the short *Straus–Duparquet* opinion did not likewise expressly say that the relevant contract had not been rejected, its decision was devoid of any mention that the contract there had been.

ance" was "severable" from their employment contracts also must be rejected. As noted above, the obligation upon which the Executives seek to recover had its origins, and its sole origins, in Section 5(a) of each of their contracts, each of which has now been rejected. Each contract had an integration clause, providing that it represented the entire agreement between the parties with respect to the subject matter hereof. There is no basis for finding that obligation in anything other than the now-rejected contracts.

Reliance on *Straus–Duparquet* as part of this severability argument[101] is likewise misplaced. The obligations held to warrant administrative expense priority by the *Straus–Duparquet* court did not emerge out of whole cloth. They were, rather, part of written collective bargaining agreements to which the debtor there was a party. The *Straus–Duparquet* court was simply determining the priority to be given to claims arising from the contract between the parties—not finding that be-

cause the claim was characterized as "severance," it could, or did, exist apart from the agreement under which it was to be paid.

### Conclusion

Given the evolution in the statutory law, the intervening caselaw, and the emphasis in each on equality of treatment of creditors and narrow construction of statutory priority since *Straus–Duparquet, Unishops,* and *W.T. Grant* were decided—and, equally significantly, the enormous factual differences between the claims of executives under rejected employment contracts and the employees in the *Straus–Duparquet* trilogy—it is no surprise, in this Court's view, that 13 of the 14 cases dealing with so called "severance" under highly compensated executives' employment contracts (whether or not such payments were, in the strictest sense, "golden parachutes")—have rejected, for one or more of the above reasons, administrative expense priority for the executives' claims.[102]

---

**101.** Executives Response (ECF # 327) ¶ 14.

**102.** Though the Court decides these issues on the language of the Code and the caselaw, it cannot help but note the tremendous unfairness to other creditors that would result from the acceptance of the Executives' contentions, and from mechanical application of *Straus–Duparquet, Unishops* and *W.T. Grant.* As the First Circuit held in *Filene's Basement,* declining to award administrative priority to the "severance" claims there, under another senior executive's employment contract:

> If one takes [claimant's] argument to its logical terminus, an executive would be entitled to administrative priority for lump-sum severance pay, no matter how astronomical, simply by working one day for the debtor in possession so long as she was in "good standing at the time of discharge." . . . [W]e cannot accept this conclusion.

330 F.3d at 46. And the *Hooker* court noted how granting administrative priority to the claimant's $4 million claim, "merely because

he worked for the Debtors for a few months post-petition," would contravene the policies underlying the debtor's right to reject and the treatment of administrative expenses. 145 B.R. at 150. As it further noted, granting such "talismanic significance" to the employee's time of discharge would elevate any termination pay claim, even if it is only post-petition by one minute, to an administrative expense, even if the debtor later rejected the contract. *Id.* If that were the rule, the *Hooker* court observed, no debtor would be able to avoid administrative expense liability for executives' "severance" unless it fired all of its executives before filing.

This would result in a Catch–22 for the debtor: If *Straus–Duparquet* requires that the debtor fire all its executives pre-petition, then the going concern debtor would be left without a captain of the ship. Yet if the debtor does not do so, the debtor-in-possession will be saddled with a large administrative expense claim even if it finds that it has no need for an executive's services shortly after filing. There is no indication that the *Straus–Duparquet* court intended such a result.

The cases declining to award priority on such payments have included five decisions of courts of appeals, and all six of the cases in this district. The facts in this case make the Executives here no more deserving than the executives in any of the others.

For the foregoing reasons, the objections to payment are sustained. The Executives' claims are disallowed as administrative claims, and are reclassified as general unsecured claims, without prejudice to the rights of the Executives, or any other party in interest, with respect to their allowability or amount.

SO ORDERED.